Iberia **HAMPTON** et al., Plaintiffs,

v.

Edward V. **HANRAHAN** et al., Defendants.

No. 70 C 1384.

United States District Court, N. D. Illinois, E. D.

Oct. 10, 1980.

G. Flint Taylor, Jr., Dennis Cunningham, Jeffrey Haas, Jonathan C. Moore, James D. Montgomery, Chicago, Ill., for plaintiffs.

John P. Coughlan, Joseph Witowski, John Tuohy, Gregory Jones, Chicago, Ill., for defendants.

**SHADUR, District Judge.**

Upon remand from the United States Supreme Court [1] reversing in part the decision of the Court of Appeals for the Seventh Circuit, 600 F.2d 600 (7th Cir. 1979), this action was assigned to me under this Court's random reassignment system. Various of the defendants (the "State Defendants") have moved that I disqualify myself in this case under 28 U.S.C. §§ 144 and 455 and that the case be transferred to the Executive Committee for reassignment.

It should be made plain at the outset that *none* of the grounds relied on by the State Defendants involves any claimed *personal* conduct, bias, prejudice or knowledge on my part in any respect.[2] Indeed I know none of the parties to the action and have no personal knowledge of any facts involving the subject matter of this case. Nor do I have any social or other relationship with any of the lawyers representing any of the parties.

Instead the claimed bases for disqualification are entirely vicarious: They relate to prior involvements of the Chicago Chapter of the Lawyers' Committee for Civil Rights under Law ("Lawyers' Committee") and of one of my former partners in the law firm (now Krupp & Miller) with which I was associated for over thirty years in the practice. These actions of *other* persons are

asserted to invoke the provisions of 28 U.S.C. § 455 (only the possibly relevant provisions are quoted):

(a) Any justice, judge or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

(b) He shall also disqualify himself in the following circumstances:

\* \* \* \* \* \*

(2) Where in private practice he served as lawyer in the matter in controversy, or a lawyer with whom he previously practiced law served during such association as a lawyer concerning the matter, or the judge or such lawyer has been a material witness concerning it; . . . .

When Section 455 was amended to take its present form in 1974, it was intended to substitute objective criteria for disqualification in place of the former subjective standard (under which the opinion of the judge was made conclusive) and to modify the pre–existing "duty to sit" concept that had previously placed sharp limitations on the granting of recusal motions. *SCA Services, Inc. v. Morgan*, 557 F.2d 110, 113 (7th Cir. 1977). Although I have termed the new statutory criteria "objective," it is obvious from the language of Section 455 that subsection (b) involves standards that are truly objective in the sense of dealing with ascertainable *facts*, while subsection (a) is necessarily judgmental in nature.

■ Against that background I will review the several matters asserted by the State Defendants. Though they mention it last, I will deal first with the one item that .does not relate to the Lawyers' Committee:

3. Milton Shadur was a member in the law firm, a member of which, Abner Mikva, addressing Congress, requested an investigation of the State Defendants' conduct on December 4, 1969.

---

1. 446 U.S. 754, 100 S.Ct. 1987, 64 L.Ed.2d 670 (1980).

2. Because the affidavit filed by the State Defendants in support of their motion fails either to charge "personal bias and prejudice" on my part or facts that would support such a charge, 28 U.S.C. § 144 is inapplicable by its terms. This memorandum opinion is accordingly limited (as are the assertions in the motion) to consideration of 28 U.S.C. § 455.

That item borders on the frivolous and, if it were the only issue tendered by the State Defendants, would cast serious doubt on their certification that the motion is made in good faith. It is frankly untenable to impute the views of a United States Congressman, expressed on the floor of the House of Representatives in his official capacity, to the members of the law firm in which he was a partner. But even that issue need not be dealt with here. In any case, the complete answer to that item is that then Congressman (now Court of Appeals Judge) Mikva had ceased to be a partner in our law firm at the end of 1968, upon having been elected to Congress. We made that decision jointly because we shared the view that membership in Congress was a full–time activity that could present a possible appearance of impropriety if it were coupled with the continuing practice of law by the Congressman. So this item in the State Defendants' motion is without merit on two independent grounds.

■ Each of the other matters referred to by the State Defendants relates to actions by Lawyers' Committee. That organization was founded in 1969 as an unincorporated association by 17 Chicago law firms. Today its membership comprises 50 law firms (Lawyers' Committee is affiliated with the National Lawyers' Committee for Civil Rights Under Law, Washington, D. C.). In April 1971 the firm then known as Devoe, Shadur, Plotkin, Krupp & Miller, in which I was a partner, joined Lawyers' Committee.

From the outset Lawyers' Committee's stated purposes were the same as are now stated in its Articles of Incorporation:

To provide for the furnishing of legal services (but only by individuals licensed to practice law in the State of Illinois) and related services without charge to individuals and organizations located within the State of Illinois in matters which will have a broad impact on the availability of opportunities to them now or in the future and where such individuals or organizations are otherwise unable to afford the cost of such legal and related services.

As indicated by its name, the organization's focus has been limited to civil rights matters. Its financial support has always stemmed from voluntary contributions by the participating law firms. Although it has a small staff (presently including its executive director, herself a lawyer, and two other staff lawyers), its substantive involvements in areas of civil rights are largely carried out by volunteer lawyers who render *pro bono* services without charge in matters in which they individually choose to become involved. Its staff people both coordinate the volunteer activity and work on Lawyers' Committee matters in their own right. Each member firm designates one of its lawyers as a liaison person with Lawyers' Committee, though the liaison person does not necessarily participate in any specific legal matter on which members of his or her firm may agree to act as volunteers. Those liaison persons serve as a full committee that select what was formerly termed the Executive Committee (now the Board of Directors) and chairpersons. Lawyers' Committee has been incorporated as a not–for–profit corporation with tax exempt status since 1976, but its operations have continued in the same manner.

Beginning with the December 1969 raid that gave rise to this action, the State Defendants' motion refers to the following Lawyers' Committee–related involvements in connection with its subject matter:

1. On December 11, 1969 twelve individuals who were members of the law firms participating in Lawyers' Committee sent a telegram to United States Attorney General John Mitchell urging that a special grand jury be convened to investigate the raid. Neither I nor any other member of my law firm was involved in that telegram. At that time my firm had no affiliation with Lawyers' Committee.

2. In 1970 Lawyers' Committee was one of four organizations (the others were the Chicago Bar Association, Chicago

Council of Lawyers and American Civil Liberties Union) that petitioned for and obtained an order from the Circuit Court of Cook County appointing a special prosecutor, Barnabas Sears, with authority to convene a grand jury to determine whether any indictable offenses had been committed during the raid. That also antedated my law firm's participation or membership in Lawyers' Committee.

3. In 1971 Lawyers' Committee and five other organizations filed briefs amicus curiae in the Illinois Supreme Court in support of Special Prosecutor Sears' two petitions for mandamus (*People v. Sears*, 49 Ill.2d 14, 273 N.E.2d 308 (1971) and Ill.S.Ct. No. 44586). At that time, my law firm had become a member of Lawyers' Committee and I was my law firm's designated liaison person to the Committee, but neither my firm nor I was involved in the decision to file the petitions or in their preparation, and I was not listed as counsel.

4. In 1973 Lawyers' Committee moved for leave to appear as amicus curiae in the Illinois Supreme Court in another action by Special Prosecutor Sears for a writ of mandamus and prohibition (because the Sears motion for leave to file the petition was denied, Lawyers' Committee's motion was also denied). At that time my partner Ronald S. Miller was my law firm's designated liaison person to Lawyers' Committee and was a member of the Lawyers' Committee Executive Committee, a group made up of the liaison persons from several of the law firms participating in Lawyers' Committee. Neither Mr. Miller nor our law firm participated in the preparation of the 1973 motion.

5. In 1975 Lawyers' Committee's staff employees filed an amicus curiae brief on behalf of a number of organizations in support of the petition for mandamus filed in the Court of Appeals for the Seventh Circuit in *this*

then–pending action, seeking a writ requiring Judge Perry (a) to compel one of the present defendants to submit to questions regarding and to identify his informant, (b) to vacate his previous order severing the federal defendants and (c) to permit discovery to proceed without the trial court's *in camera* review of documents. Lawyers' Committee itself did not join in that brief. In addition, a law firm (not my own) that was a member of Lawyers' Committee prepared for submission to the Department of Justice and the FBI a Freedom of Information Act request and supporting memorandum (apparently neither was in fact actually submitted) to obtain information relating to the 1969 raid. At that time Ronald Miller was still my law firm's designated liaison person to Lawyers' Committee and still a member of its Executive Committee. Neither Mr. Miller nor our law firm participated in the preparation of the proposed FOIA request.

6. In 1978 Lawyers' Committee filed an amicus brief in our Court of Appeals urging reversal of Judge Perry's directed verdicts in this action. That appeal was successful (see 600 F.2d 600) and gave rise to the remand and reassignment to my calendar. At that time Ronald Miller was, as before, our law firm's designated representative to Lawyers' Committee and a member of Lawyers' Committee's Board of Directors, and he was also serving as Lawyers' Committee's co–chairperson. In that capacity he participated in the decision to authorize the filing of the amicus brief (a decision that was submitted to the representatives of all member firms for approval). Three law firms, not including my own, prepared the brief and appeared as counsel for Lawyers' Committee as amicus. In the memorandum seeking approval of the member firms for the brief, Lawyers'

Committee's Executive Director specified that the brief would be approved for submission to the Court by the Executive Director and the two co–chairpersons (thus including Mr. Miller). Mr. Miller's time records reflect that he did spend time in the review of that brief before filing and discussed the brief with another partner in our law firm (but not with me). Thereafter, after the filing of the brief and after the Court of Appeals had handed down its decision, the same counsel who had prepared the original amicus brief prepared and filed a brief on behalf of Lawyers' Committee as amicus curiae opposing rehearing *en banc* and supporting the award of attorney's fees to plaintiff's counsel.

Some other Lawyers' Committee matters are referred to in the State Defendants' supporting affidavit:

1. Lawyers' Committee itself is plaintiff in an action in this Court against the City of Chicago, then Mayor Daley, then Police Commissioner Rochford, Marlin Johnson (who is one of the defendants in this action) and a number of other defendants. My former partner, Ronald Miller, is one of the attorneys listed as counsel for Lawyers' Committee in that matter. Its subject matter is wholly unrelated to the subject matter of the present action.

2. Another case pending in this Court, brought by the Alliance To End Repression and a number of other plaintiffs, including three of the attorneys for plaintiffs in this action, has been consolidated for discovery with the Lawyers' Committee action referred to in the preceding paragraph.

3. In 1969 one of the member law firms of Lawyers' Committee (not my own firm) represented certain doctors cooperating with the Black Panthers in their effort to establish a community health center on the west side of Chicago.

4. In 1972 another member law firm of Lawyers' Committee provided legal assistance to Free Services, Inc., which has operated a free breakfast program for poor children as an arm of the Black Panther Party and was then being incorporated to secure federal tax exempt status.

Simply to recite these last items demonstrates that they merit the same comments as the State Defendants' reference to the congressional speech by Abner Mikva. It would be charitable to characterize them as even makeweight factors in a bona fide motion for disqualification. Accordingly, the only matters that require serious analysis are those that I have previously itemized in connection with the subject matter of this case.

None of those matters requires disqualification under the specific and objective standards of Section 455(b). Only one of those provisions could even arguably apply:

Where in private practice he served as lawyer in the matter in controversy, or a lawyer with whom he previously practiced law served during such association as a lawyer concerning the matter, or the judge or such lawyer has been a material witness concerning it; . . . .

and for the reasons hereafter stated, it plainly does not.

As indicated earlier, the one matter in which Ronald Miller—"a lawyer with whom [I] previously practiced law"—served "as a lawyer" was the suit against the City of Chicago and numerous others, including Marlin Johnson, one of the defendants here. Because that lawsuit, wholly unrelated to the present action, is not "the matter in controversy," Section 455(b)(2) does not apply to that matter.

Conversely, in each of Lawyers' Committee's involvements in earlier stages of this case, or in related actions that might arguably qualify as "the matter in controversy," Mr. Miller did not "serve . . . as a lawyer concerning the matter." In the closest instance, the 1978 amicus brief in the appeal that preceded the remand to this Court, Mr. Miller participated in the approval of the

filing of the brief, but he did so as co–chairperson of Lawyers' Committee—that is, as the *client* not the *lawyer*.

When we consider Section 455(a), however, the problem is more difficult. Lawyers' Committee is not an organization like (say) the Chicago Bar Association or American Civil Liberties Union, in which participation is solely on an individual basis. Thus if Mr. Miller had been an officer of the CBA or of ACLU, and if that organization had involved itself in this matter in the same way as Lawyers' Committee has done, there would have been no reasonable basis for imputing that activity to me. But because it was my former *law firm* that was a Lawyers' Committee member, Mr. Miller's service on Lawyers' Committee's Executive Committee and Board of Directors and as co–chairperson might reasonably be ascribed to the law firm. By the same token, his approval of Lawyers' Committee's 1978 amicus brief, though it was not in fact discussed with or submitted to me, appears to have been discussed with another partner in the law firm. Thus it might reasonably be deemed to have been an action taken as a representative of the firm in its membership relationship with Lawyers' Committee.

■ In the related area of lawyer disqualification for conflicts of interest, the knowledge and actions of any partner in a law firm are imputed to every other partner. *Westinghouse Corp. v. Kerr–McGee Corp.*, 580 F.2d 1311, 1318 (7th Cir. 1978); *Schloetter v. Railoc of Indiana, Inc.*, 546 F.2d 706, 710 (7th Cir. 1976). It is considered to be contrary to public policy to inquire as to whether communications regarding client confidences and secrets in fact took place. *Schloetter*, 546 F.2d at 710.

■ Although the two situations are not exactly parallel and the considerations do differ somewhat, it would clearly tend to undermine confidence in the judicial system if judges were viewed as being held to lower standards of propriety than lawyers. Section 455(a) is the judicial counterpart of Canon 9 of the lawyers' Code of Professional Responsibility ("A lawyer should avoid even the appearance of professional impropriety"). Though I am morally certain that I would in fact be impartial in this proceeding, that is not the standard; the test is rather whether my impartiality "might reasonably be questioned." If knowledge and approval of a legal position by a law firm partner is to be imputed to his other partners for purposes of lawyer disqualification (whether or not the other partners had any knowledge of the matter), and if public policy precludes inquiry into the *facts* regarding knowledge of those other partners, in my opinion no lesser standard can be applied in ruling on judicial disqualification. From that perspective, my own lack of personal knowledge of the matter is legally irrelevant.

■ As already discussed, several of the matters sought to be relied on by the State Defendants are clearly groundless. But those weaknesses do not detract from the force of the legal question posed by the 1978 activities of Lawyers' Committee and my former partner as its then co–chairperson. Plaintiffs argue essentially that the State Defendants are engaged in impermissible judge–shopping, but my decision also cannot properly be affected by considerations as to the possible underlying motives for the motion to disqualify.

Plaintiffs also argue that participation as amicus curiae differs from being a party to the litigation (a possible distinction I commented on when the present motion was initially submitted). However, the vigorous advocacy of Lawyers' Committee in the 1978 appeal (properly vigorous, given the Committee's viewpoint on the merits) did not differ in kind from that of plaintiffs themselves, and in my view the same principles apply.

Accordingly, I have concluded that the State Defendants' motion is well grounded in law because it is possible that my "impartiality might reasonably be questioned," and this action is transferred to the Executive Committee of this Court for reassignment.