Arthur Eugene OTHEN, next friend of his daughters, Pamela Evelyn Othen and Janice Julia Othen, Plaintiff,

v.

ANN ARBOR SCHOOL BOARD, a public body established under the laws of the State of Michigan, Defendant.

Civ. A. No. 79–73709.

United States District Court,
E. D. Michigan, S. D.

Feb. 23, 1981.

---

Jean L. King, Ann Arbor, Mich., for plaintiff.

Edmond F. DeVine, Ann Arbor, Mich., for defendant.

Madeline Chun, Civ. Rights Div., U. S. Dept. of Justice, Washington, D. C., Charles E. Guerrier, Women's Law Fund, Inc., Cleveland, Ohio, for amicus.

MEMORANDUM OPINION AND ORDER

JOINER, District Judge.

This case forces the court to a decision on the validity of regulations of the Depart-

ment of Health, Education and Welfare [hereinafter "HEW"][1] applying the department's anti-sex discrimination rules to athletic teams when the school district receives federal financial assistance for other programs but none for athletics.

The original complaint in this lawsuit was filed on September 21, 1979. It alleged sex discrimination against the defendant school board, charging that one of the plaintiff's daughters, Pamela, was "cut" from the Pioneer High School's golf team because of her sex. At that time, the school had one golf team. Among other things, the complaint sought a temporary restraining order to have the plaintiff's daughter restored to membership on the golf team. It also prayed for a permanent injunction prohibiting sexual discrimination in the golf team's selection process.

On September 28, 1979, the plaintiff made a motion for a preliminary injunction to require that his daughter be allowed to continue as a member of the 1979 Pioneer High School golf team. Other relief was also requested. On October 1, 1979, the plaintiff's motion for a preliminary injunction was argued before the court and evidence was taken. The motion was denied because the plaintiff failed to show the likelihood of success on the merits.

Thereafter, the plaintiff made a motion for permission to file an amended complaint which, among other things, sought to expand the relief requested to include a claim that the refusal of the school to provide a separate boys' and girls' golf team was a denial of his daughters' rights to equal education opportunities.[2] In a May 1, 1980 order, after reviewing the complaint, the court ordered that the document entitled "Complaint Submitted in Substitution for Original Complaint" be docketed and treated as the complaint upon which the case

would go forward. The amended complaint was permitted to be filed and the plaintiff dismissed the original claim.

The amended complaint alleged that the school board violated Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681. The complaint also alleged two state claims: (1) violation of Michigan's Elliot-Larsen Civil Rights Act of 1976, M.S.A. §§ 3.548(301), 3.548(302), 3.548(401), and 3.548(402), M.C.L.A. §§ 37.2301, 37.2401, 37.-2402; and (2) violation of the Michigan Public Accommodations Act, M.S.A. § 28.-334, M.C.L.A. § 750.139. The complaint prayed for: a declaratory judgment that Pioneer High School's interscholastic athletic program was not in compliance with Title IX; an order to require the defendant to develop an "equal" plan; an order requiring the defendant to implement a women's golf team; reimbursement of fees girls had allegedly expended to subsidize their own golfing; and attorney's fees.

Defendant made a motion to dismiss and for summary judgment. The United States Department of Justice filed an amicus brief on behalf of the United States, opposing the defendant's motion. In his answer to the defendant's motion, the plaintiff adopted the Justice Department's brief. (Therefore, the Justice Department's brief will be treated and referred to as the plaintiff's brief.) The Women's Law Fund also filed a motion to intervene as amicus curiae and an accompanying brief. In response to the detailed briefs filed by the Justice Department and the Women's Law Fund, the defendant filed a reply brief in support of its motion.

At the hearing on the motion, the court was informed by the plaintiff that the school board had recently provided for and formed a separate golf team for girls, and that the plaintiff was satisfied and desired to drop all claims against the defendant except the claim for attorney fees for plaintiff's attorney.[3] Thus, in determining

---

1. All functions of HEW relating to Title IX have been transferred to the Department of Education. 20 U.S.C. § 1681 (Supp.1980). However, to be consistent with the briefs of the parties, the court will continue to refer to the regulating agency as HEW or the "agency."

2. Another daughter of the plaintiff, Janice, was added in the amended complaint.

3. 42 U.S.C. § 1988 provides:

... In any action or proceeding to enforce a provision of ... *title IX of Public Law 92–*

whether the plaintiff is entitled to recover attorney fees, the court must examine the law and regulations to determine whether the plaintiff could have prevailed under the law and whether the defendant could have been forced to take the action prayed for by the plaintiff in his complaint. If the law would not permit the court to require such action, the plaintiff could not have prevailed and attorney fees should not be awarded.[4]

During the past 20 years, this country has finally begun to understand and has attempted to alleviate not only blatant and overt discrimination on the basis of sex, but also the subtle ways in which women are treated as less than equal. The struggle by women for equality continues to be one of the most important unfinished problems facing our society in the 1980s. Even though it has received a vast amount of attention by the public and on the part of Congress, the executive, and the courts, and even though leadership among women championing the cause is of high quality, women are not as yet in many walks of life treated in the same way as are their brothers.

This case is but a very small part of that struggle. Girls historically have not received the same attention as have boys, and have not had the same support (both in money and in field level coaching) in scholastic athletic programs. Here two gifted female children are asking for the same attention that is received by their brothers.[5] When a possible future Patti Berg or Nancy Lopez reaches out to the courts for help, the court must examine its power and authority carefully to see if there is a way to help.

On the other hand, the judge must remember that he is but one part of a complex governmental structure and that he must act within the framework of assigned governmental power. In the same way, a judge has the responsibility to see that other governmental agents or agencies do not act beyond their power, to see that laws and actions of the executive do not contradict the Constitution, and to see that the various agencies of government do not act beyond the powers given them by the duly elected policymakers of Congress.

I

No one in this case is contending that the Constitution of the United States has been violated by the action of Pioneer High School in not having a girls' golf team. But the plaintiff does contend that a regulation

---

*318* ... the court, in its discretion, may allow the prevailing party, other than the United States a reasonable attorney's fee as part of the costs. (Emphasis added).

4. The plaintiff has dismissed his state claims from this lawsuit. In addition, for the reasons enumerated in the opinion, the court would decline to exercise pendent jurisdiction over the state claims. *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1965).

42 U.S.C. § 1988 provides that the court may award attorney fees to the prevailing party in specific types of civil rights cases, including the present case. Since the plaintiff has voluntarily dismissed all of his original claims except for the one seeking attorney fees, the court must decide whether the plaintiff was the prevailing party under the Act notwithstanding the fact that the trial was not litigated to completion. In order to decide that attorney fees are appropriate in a case which ends before a full trial on the merits, the court must determine that the plaintiff would have survived a motion to dismiss or could have prevailed under the law. *Kahan v. Rosentiel*, 424 F.2d 161, 167 (3rd Cir.), *cert. denied*, 398 U.S. 950, 90 S.Ct. 1870, 26

L.Ed.2d 290 (1970). In *Hanrahan v. Hampton*, 499 F.Supp. 640 (1980), the Supreme Court said: "But it seems clearly to have been the intent of Congress to permit such an interlocutory award only to a party who has established his entitlement to some relief on the merits of his claims, either in the trial court or on appeal." While *Hanrahan* was decided in the context of an award of attorney fees *pendente lite*, this court concludes that the plaintiff must make a threshold showing that he has a viable claim. Such a showing would be made in the context of this case, in its present posture, by a showing that the plaintiff's claims could withstand a motion to dismiss or for summary judgment. Such a motion by the defendant is before the court and for the reasons set forth in this opinion, the court finds that the plaintiff is not the prevailing party under 42 U.S.C. § 1988 and, therefore, is not entitled to attorney fees.

5. At the time the amended complaint was filed, two of the plaintiff's daughters, Pamela and Janice, attended Pioneer High School. Pamela graduated in June, 1980, and Janice is expected to graduate in June, 1982.

of HEW has been violated, and the defendant contends that the regulation was not a valid regulation because it extends further than permitted by the law passed by Congress.

Resolution of this novel issue calls for the court to construe Title IX, codified at 20 U.S.C. §§ 1681–1686 [hereinafter "Title IX" or 20 U.S.C. §§ 1681–1686], which provides that "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681(a). Nine exceptions to the statutory right to equal educational benefits are listed, and these exceptions refer generally to activities of institutions and organizations which have traditionally offered admission or membership only to persons of one sex.[6]

In determining whether the plaintiff's daughters were discriminated against, denied benefits, or refused participation, the court must construe the following key words of the statute: ". . . under any education program or activity receiving Federal financial assistance . . . ."

The heart of the defendant's theory is that the requirements of Title IX are programmatic in nature and impose statutory obligations as to only those specific programs or activities which receive direct federal financial assistance. Since the defendant asserts that none of the athletic programs or activities within the Ann Arbor School System has received federal financial assistance in any form,[7] it contends that it is not required to have a women's athletic program or activity.

In contrast, the plaintiff asserts that the strictures of Title IX are to be applied on an institutional basis. Plaintiff argues that because the Ann Arbor School Board receives financial assistance for other activities, regulations may prohibit the Board from discriminating against or denying benefits to or excluding girls from golf when there is a boys' team. The plaintiff's theory is predicated on his contention that Title IX applies to any program or activity of any institution which receives federal financial assistance, regardless of whether or not the particular program under attack receives direct federal funding.

■ For the reasons which will be fully enumerated below, the court finds that the reach of Title IX extends only to those education programs or activities which receive direct federal financial assistance. Inasmuch as the athletic programs within the Ann Arbor Public Schools do not receive federal assistance, Title IX and the regulations passed thereunder by HEW cannot be invoked by the plaintiff in this case.

Although the court is acutely aware of the need for equality among the sexes, within and without educational institutions, the court remains duty bound to apply the laws of Congress only as broadly as they were drafted and only so far as Congress intended them to be applied. The court is also bound by the holdings and reasoning of higher courts which have touched on this issue. Those opinions support the holding this court announces today.

## II

Under 20 U.S.C. § 1682, the Secretary is authorized to promulgate "rules, regulations, or orders of general applicability" to effectuate the provisions of § 1681. Pursuant to the authority provided by § 1682, a comprehensive set of regulations has been promulgated by the agency which purports to govern the conduct of federally assisted schools in a number of specific areas. 45 C.F.R. §§ 86.1–86.71. The focus of the dispute now before the court is on the interplay between Title IX itself and the regulations promulgated by HEW *respecting ath-*

---

6. *See* 20 U.S.C. § 1681(a)(1) to (a)(9).

7. The uncontroverted affidavit of the Deputy Superintendent for Administration of the Ann Arbor Public Schools, Dr. Wiley Brownlee, states that none of the athletic programs or activities at the high schools (or any other schools) within the district received federal funding or federal financial assistance. The affidavit further states that all of the district's athletic programs are operated solely with monies derived through taxation within the state of Michigan.

*letics,* 45 C.F.R. § 86.41. Section 86.41 provides:

§ 86.41 Athletics.

(a) *General.* No person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against in any interscholastic, intercollegiate, club or intramural athletics offered by a recipient, and no recipient shall provide any such athletics separately on such basis.

(b) *Separate Teams.* Notwithstanding the requirements of paragraph (a) of this section, a recipient may operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport. However, where a recipient operates or sponsors a team in a particular sport for members of one sex but operates or sponsors no such team for members of the other sex, and athletic opportunities for members of that sex have previously been limited, members of the excluded sex must be allowed to try-out for the team offered unless the sport involved is a contact sport. For the purposes of this part, contact sports include boxing, wrestling, rugby, ice hockey, football, basketball and other sports the purpose of major activity of which involves bodily contact.

(c) *Equal Opportunity.* A recipient which operates or sponsors interscholastic, intercollegiate, club or intramural athletics shall provide equal athletic opportunity for members of both sexes. In determining whether equal opportunities are available the Director will consider, among other factors:

(1) Whether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes;

(2) The provision of equipment and supplies;

(3) Scheduling of games and practice time;

(4) Travel and per diem allowance;

(5) Opportunity to receive coaching and academic tutoring;

(6) Assignment and compensation of coaches and tutors;

(7) Provision of locker rooms, practice and competitive facilities;

(8) Provision of medical and training facilities and services;

(9) Provision of housing and dining facilities and services;

(10) Publicity.

Unequal aggregate expenditures for members of each sex or unequal expenditures for male and female teams if a recipient operates or sponsors separate teams will not constitute noncompliance with this section, but the Director may consider the failure to provide necessary funds for teams for one sex in assessing equality of opportunity for members of each sex.

\*     \*     \*     \*     \*     \*

These provisions respecting athletics purport to apply to any recipient of federal funds and, thereby, according to the defendant, run afoul of the program specific language contained in the underlying legislation of Title IX. The plaintiff contends, however, that the provisions comport with the intent of Congress to eliminate sexual discrimination within educational institutions. This clash between the institutional approach as proffered by the plaintiff and the programmatic approach urged by the defendant creates the parameters of this decision.

■ After examining the choice of language used by the drafters of Title IX, it is clear to the court that the Act's provisions and requirements apply only to the specific class of educational programs or activities which receive direct federal financial assistance. This is made apparent in 20 U.S.C. § 1681(a), which states: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education *program or activity receiving Federal financial assistance* . . . ." (Emphasis added). Moreover, 20 U.S.C. § 1682, the enabling provision for Title IX's regulatory scheme—the provision by which the agency and the courts are

bound when determining the permissible scope of any regulations instituted to effectuate Title IX—limits the agency's authority to promulgate rules, regulations, or orders to include only those programs or activities receiving federal financial assistance.

> Each Federal department ... which is empowered to extend Federal financial assistance to any education program or activity ... is authorized and directed to effectuate the provisions of section 1681 of this title *with respect to such program or activity* by issuing rules, regulations, or orders .... 20 U.S.C. § 1682 (Emphasis added).

Section 1682 also contains an enforcement provision which provides for termination of assistance. This enforcement power of termination is limited to particular programs or activities which receive federal financial aid. "[S]uch termination or refusal shall be limited to the particular political entity, or part thereof ... and shall be *limited in its effect to the particular program, or part thereof, in which such noncompliance has been found.*" 20 U.S.C. § 1682 (Emphasis added).

By carefully examining the language used by Congress in drafting the various provisions of Title IX, it is clear that Congress was aware of the distinction between the concept of an institutional approach as compared to the concept of a programmatic approach. For example, in the same title, Congress used the institutional approach when dealing with those with impaired vision. This section of Title IX, 20 U.S.C. § 1684, reads:

> No person in the United States shall, on the ground of blindness or severely impaired vision, be denied admission in any course of study by a *recipient* of Federal financial assistance for any education program or activity .... (Emphasis added).

Congress intended to make a distinction between an institutional approach and a programmatic approach. The precise, selective use of the terms "programs" and "recipient" throughout the various sections of Title IX evidences a clear intent to have sections 1681 and 1682, and the regulations thereunder, apply only to specific educational programs or activities which receive direct federal financial assistance.

The court is of the opinion that the most instructive source for determining the meaning and scope of the Act is found in the Act itself, as highlighted above. The Act is clear on its face and it is limited in scope to education programs or activities which are direct recipients of federal financial assistance.

Significantly, the original Senate version of Title IX was institutional in nature, in accord with the plaintiff's theory, and provided:

> No person in the United States shall, on the ground of sex, be excluded from participation in, be denied the benefits of, or be subject to discrimination under any program or activity *conducted by a public institution* ... which is a *recipient* of Federal financial assistance for any education program or activity .... 117 Cong.Rec. 30156 (1971) (Emphasis added).

In keeping with this institutional approach, the enforcement provision did not contain the pinpoint provision which was ultimately adopted in the final version. The final version now states "[such termination] shall be limited in its effect to the particular program, or part thereof, in which such noncompliance has been so found ...." 20 U.S.C. § 1682. The absence of the pinpoint provision in the original version was consistent with the institutional approach of the original Senate version. However, the original version of the Act was rejected and in its stead a program specific Act was enacted which contained the pinpoint provisions for application of the Act and for enforcement of the Act. This substitution by Congress of a programmatic approach for an institutional approach is indicative of Congress' intent to limit the scope of Title IX. *See* Kuhn, *Title IX: Employment and Athletics Are Outside HEW's Jurisdiction,* 65 Geo.L.J. 49, 64–65 (1976) (hereinafter cited as *Employment and Athletics* ).

In 1974, Congress adopted an amendment to the Act which plaintiff asserts evidences an intent of Congress to include athletics

within the Act's coverage. Section 844 of the Education Amendments of 1974, Pub.L. No. 93–380, 88 Stat. 612, provides:

Provision Relating to Sex Discrimination

Section 844. The Secretary shall prepare and publish, not later than 30 days after the date of enactment of this Act, proposed regulations implementing the provisions of title IX of the Education Amendments of 1972 relating to the prohibition of sex discrimination in federally assisted education programs which shall include with respect to intercollegiate athletic activities reasonable provisions considering the nature of particular sports.

However, a careful evaluation of the legislative history of the amendment indicates that the drafter of the original amendment, Senator Tower, included this provision only as a protection for revenue producing intercollegiate sports in the event that a court would improperly endorse HEW's regulations respecting athletic programs.

[A]ccording to my recollection and detailed, recent investigation, I do not believe that Congress intended Title IX to extend to intercollegiate athletics.... However, if a court should hold that HEW has authority to promulgate rules affecting intercollegiate athletics, HEW would be free under Title IX to prescribe rules for all but the narrow class of revenue-producing sports. 120 Cong.Rec. 15323 (1974).

The clear language of Title IX and the intent of Congress requires that the Act be applied programmatically.[8]

Commentators have uniformly stated that there is little information of significance in the legislative history which has a direct bearing on the issue. *See, e. g., Cox, Intercollegiate Athletics and Title IX*, 46 Geo.Wash.L.Rev. 34, 36 (1977); Note, *Sex Discrimination and Intercollegiate Athletics: Putting Some Muscle on Title IX*, 88 Yale L.J. 1254, 1255 n.11 (1979); Comment, *HEW's Regulations Under Title IX of the Education Amendments of 1972: Ultra Vires Challenges*, 1976 B.Y.U.L.Rev. 133 [hereinafter cited as *Ultra Vires Challenges*]. Several commentators tender persuasive arguments which state that the regulations are overbroad. *See generally* Note, *Title IX Sex Discrimination Regulations: Impact on Private Education*, 65 Ky. L.Rev. 656 (1977) [hereinafter cited as *Impact on Private Education*]; Kuhn, *Employment and Athletics*, 65 Geo.L.J. 49 (1976).

### III

Although presented in the context of the plaintiff's attempt to recover attorney fees, this court is squarely faced with an issue that has never before been decided. The court must decide whether the agency's regulations respecting athletics are overbroad inasmuch as they purport to regulate the athletic programs of all recipients of federal financial aid, regardless of whether or not those funds are specifically earmarked for athletic programs or activities.

An opinion by Chief Judge John Feikens of this district, in *Romeo Community*

---

**8.** The plaintiff argues that congressional failure to disapprove of the regulations in question within forty-five days of their transmission to Congress evidences congressional approval. This court rejects the plaintiff's argument for the same reasons enunciated in *Islesboro School Committee v. Califano*, 593 F.2d 424 (1st Cir.), *cert. denied*, 444 U.S. 972, 100 S.Ct. 467, 62 L.Ed.2d 387 (1979), where the Court of Appeals rejected an identical argument made by the government.

By statute, the regulations become effective forty-five days following their transmission to Congress unless Congress affirmatively, by concurrent resolution, acts to disapprove them. 20 U.S.C. § 1232(d)(1), (f). Since Congress had the opportunity to disapprove

the regulations, HEW argues that the failure to do so is strong evidence in favor of their propriety. We disagree. Congressional inaction should not lightly be construed as approval. This was underscored by the passage, five months following the transmission of the regulations here at issue, of an amendment providing that the failure of Congress to disapprove a final regulation should be construed neither as approval of the regulation nor as a congressional finding of consistency with the act granting authority to promulgate the regulation. Pub.L. No. 94–142 §§ 7(a)(1), (b), 89 Stat. 796 (1975) (codified at 20 U.S.C. § 1232(d)(1)). 593 F.2d at 428–29 n.3.

**1384**

*Schools v. HEW,* 438 F.Supp. 1021 (E.D. Mich.1977), *aff'd,* 600 F.2d 581 (6th Cir.), *cert. denied,* 444 U.S. 972, 100 S.Ct. 467, 62 L.Ed.2d 388 (1979), lends support for this court's holding. In *Romeo,* the school board brought an action for a declaratory judgment and a permanent injunction, challenging the legality of HEW's regulations, promulgated under Title IX, which purported to regulate sex discrimination in the relationship between federally funded public schools and their teacher employees. 45 C.F.R. §§ 86.51–86.61. The wide-ranging regulations cover many diverse types of employment practices, including recruitment, compensation, and job classification. The specific focus of the litigation was 45 C.F.R. § 86.57 "which requires all federally assisted schools to treat pregnancy equally with sickness and disability for the purposes of leave and compensation benefits. . . ." 438 F.Supp. at 1024.

Judge Feikens held that the regulations exceeded the scope of HEW's authority under Title IX and were, therefore, invalid and of no legal force and effect. In reaching his decision, Judge Feikens focused on the language of 20 U.S.C. § 1681 and stated, "[T]hough cast in broad terms, § 1681 nevertheless addresses itself only to sex discrimination against the *participants in and the beneficiaries* of federally assisted education programs." 438 F.Supp. at 1031 (Emphasis added).

While *Romeo* focused on the issue of whether teachers were covered classes of persons under Title IX, the analysis and logic of that opinion is highly relevant to this case. Judge Feikens' conclusion—reached in the context of an attack on HEW's attempt to regulate employment practices of federal fund recipients—that Title IX is program specific is in accord with this court's holding.

> Section 1681 was written in broad terms not to cover all forms of sex discrimination in education, but *only to cover* the wide variety of *education programs funded by the federal government* and the many ways in which sex discrimination against students *in those programs* can be manifested. 438 F.Supp. at 1032 (Emphasis added).

Judge Feikens also aptly noted that the program specific limitation on HEW's enforcement power under § 1682 "is implicitly a limitation on HEW's authority to regulate as well." 438 F.Supp. at 1033. He went on to state:

> HEW cannot regulate the practices of an educational institution unless those practices result in sex discrimination against the beneficiaries of some federally assisted education program operated by the institution. The focus of § 1681—elimination of sex discrimination in federally funded education programs—must be the focus of HEW's regulations under § 1682 as well. To this extent, HEW's regulatory power is also "program specific." 438 F.Supp. at 1033.

In affirming Judge Feikens' opinion and the reasoning contained therein, the Court of Appeals stated, "[U]nless the discrimination [allegedly committed by an education institution under Title IX] relates to a program or activity which receives federal funding, it is not prohibited." 600 F.2d 581 at 584.

■ The court finds that the logic and rationale employed by Judge Feikens and the Court of Appeals in *Romeo*—although made in the context of the agency's efforts to regulate employment within recipient institutions—is equally applicable to the present case. The clear import of those opinions is that Title IX is programmatic in nature. Any regulations promulgated by the agency which go beyond the scope of that programmatic approach cannot serve as the basis for a private lawsuit.

Several other courts of appeals have held the same as *Romeo* in striking down the agency's regulations concerning sex discrimination in the employment relationship between educational institutions and its employees. *Dougherty County School System v. Harris,* 622 F.2d 735 (5th Cir. 1980); *Seattle University v. HEW,* 621 F.2d 992 (9th Cir. 1980); *Junior College District of St. Louis v. Califano,* 597 F.2d 119 (8th Cir.), *cert. denied,* 444 U.S. 972, 100 S.Ct. 467, 62 L.Ed.2d 388 (1979); *Islesboro School Committee v. Califano,* 593 F.2d 424 (1st Cir.),

*cert. denied*, 444 U.S. 972, 100 S.Ct. 467, 62 L.Ed.2d 387 (1979). *Contra, North Haven Board of Education v. Hufstedler*, 629 F.2d 773 (2d Cir. 1980).[9]

In *Gomes v. Rhode Island Interscholastic League*, 469 F.Supp. 659 (D.R.I.), *vacated as moot*, 604 F.2d 733 (1979), the court granted a preliminary injunction to prevent school officials from prohibiting the male plaintiff from playing on the all-girls' high school volleyball team. Title IX and the regulations which are the subject of the present litigation formed the basis for the *Gomes* decision.

However, the court in *Gomes* expressly stated that resolution of the dispute involved the interpretation and application of the regulations. The regulations were presumed to apply. In fact, both sides agreed

that the regulations applied. Therefore, the matter turned on an interpretation of 45 C.F.R. § 86.41(b) of the agency's regulations.[10] Unlike the issue in the present lawsuit, the *Gomes* court was never faced with an overbreadth attack against the regulations. The parties were in agreement on the very issue which is in dispute in this case. For that reason, the plaintiff's reliance upon *Gomes* is ill-founded.

The plaintiff also cites to the recent opinion of *Iron Arrow Honor Society v. Hufstedler*, 499 F.Supp. 496 (S.D.Fla.1980), in support of his institutional approach. In *Iron Arrow*, an all-male honor society of the University of Miami (Florida) sought an injunction to prohibit HEW from "interpreting its Regulation § 86.31(b)(7) in such a way as to deter the University of Miami

---

**9.** In *North Haven Bd. of Ed. v. Hufstedler*, 629 F.2d 773 (2d Cir. 1980), the Court of Appeals for the Second Circuit reversed the trial court's ruling which had followed the *Romeo* court's holding in finding HEW's employment regulations invalid. This opinion by the Second Circuit represents a distinct minority position among the courts of appeal which have decided the question and it is in direct contradiction with the Court of Appeals for the Sixth Circuit. This court is bound by the decisions of the Court of Appeals for the Sixth Circuit.

Moreover, the basis for the *North Haven* decision is unclear. The dispute over the employment regulations focuses on several matters. One issue is whether teachers are within the class of persons to be protected by Title IX. Assuming that the answer is yes (an assumption that was expressly rejected in *Romeo*), another issue is whether Title IX is applicable only where discrimination in employment affects the staff of a particular program receiving direct federal assistance. (Some advocates argue that discrimination in employment within a school system affects all programs and, therefore, the system becomes a "program" under Title IX.) The Court of Appeals for the Second Circuit expressly withheld opinion on the issue of whether "any fund terminations had to be limited to a particular program or particular programs." Slip op. at 776. Yet, this very issue left open by the Court of Appeals is the one this court must address. The Second Circuit merely held that the agency has authority under Title IX to promulgate the employment regulations which were at issue. In addition to the fact that this holding is in direct contradiction with the Court of Appeals for the Sixth Circuit, no determination was made by the Second Circuit as to whether Title IX had been

violated or, if so, what remedies were available. The case was remanded to decide those issues.

**10.** 45 C.F.R. § 86.41(b) provides:

(b) Separate Teams. Notwithstanding the requirements of paragraph (a) of this section, a recipient may operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport. However, where a recipient operates or sponsors a team in a particular sport for members of one sex but operates or sponsors no such team for members of the other sex, and athletic opportunities for members of that sex have previously been limited, members of the excluded sex must be allowed to try-out for the team offered unless the sport involved is a contact sport. For the purposes of this part, contact sports include boxing, wrestling, rugby, ice hockey, football, basketball and other sports the purpose of major activity of which involves bodily contact.

The defendant school board argued that the language "and athletic opportunities for members of that excluded sex have previously been limited" made the regulation applicable only if the particular sex had been discriminated against in a general, overall sense with respect to athletic opportunities. The court rejected this interpretation by saying:

If the Court accepts defendants' interpretation, however, serious questions arise concerning the constitutionality of the regulation. The defendants' approach would authorize schools to establish female teams in any sport without equivalent male teams because women have been generally deprived of athletic opportunities. Such a broadly focused remedial program may run afoul of the equal protection clause. 469 F.Supp. at 664.

from permitting the Iron Arrow Honor Society to conduct certain functions on the University campus." 499 F.Supp. at 498–99.

Section 86.31(b)(7) provides:

(b) Specific Prohibitions. Except as provided in this subpart, in providing any aid, benefit, or service to a student, a recipient shall not, on the basis of sex:

\* \* \* \* \* \*

(7) Aid or perpetuate discrimination against any person by providing significant assistance to any agency, organization, or person which discriminates on the basis of sex in providing any aid, benefit, or service to students or employees.

The University provided certain support to the Iron Arrow Society;[11] but after an HEW finding that the University's relationship with the Society was in violation of Title IX, the University sought to sever its 50-year relationship with the Society. This action prompted the suit by the Society.

The court upheld the agency's regulations. However, the focus of and the basis for the decision is unclear. The plaintiff's argument was based on the proposition that Congress did not intend honor and recognition societies to be covered under Title IX. There was no express decision rendered on the institutional/programmatic dispute such as the one presented by the case before this court. Moreover, to the extent that *Iron Arrow* is interpreted as mandating an institutional approach to Title IX, the Court of Appeals in this circuit in *Romeo* rejected that notion.[12]

■ After evaluating all of the Title IX cases cited by the parties,[13] the court finds

---

11. The forms of assistance given by the University to Iron Arrow adduced during this lawsuit include: the use of real property located in front of the student union building in the center of the campus, called by Iron Arrow a "mound" and bearing a monument exalting Iron Arrow as "the highest honor in the University of Miami"; the existence of other plaques and statues throughout the campus recognizing Iron Arrow; the special recognition given to Iron Arrow at the University's homecoming football game; the use of the campus for Iron Arrow's tapping ceremony which takes place on the mound, a charter given to Iron Arrow by the University; the formal sponsorship of Iron Arrow by every president of the University throughout its history; the provision of secretarial services, mail boxes, mailing labels, and special meeting rooms to Iron Arrow, the existence of a faculty screening committee to propose new members to the society; and the special recognition of Iron Arrow in the University catalogue as the "highest recognition society for men." 499 F.Supp. at 505.

12. Moreover, in a subsequent decision by the Court of Appeals for the Fifth Circuit—the jurisdiction in which Iron Arrow was decided—some doubt was cast upon the continued validity of *Iron Arrow*'s adoption of an institutional approach. In *Dougherty County School System v. Harris*, 622 F.2d 735 (5th Cir. 1980), the Court of Appeals held that HEW's employment regulations exceeded the scope of the Act inasmuch as they extended to employees who were in no way connected with any federally assisted program. *Dougherty*'s programmatic approach casts strong doubt on the validity of *Iron Arrow*'s acceptance of an institutional approach. This is so, notwithstanding footnote one of the *Iron Arrow* opinion, 499 F.Supp. at 503 n.1, which attempts to bring the case within the guidelines of *Dougherty*.

13. *Grove City College v. Harris*, 500 F.Supp. 253 (W.D.Pa.1980), was cited by the plaintiff in support of his institutional approach to Title IX. The college refused to execute HEW's "Assurance of Compliance" form whereupon HEW initiated compliance proceedings. The dispute centered upon whether or not the college was a recipient of federal financial assistance by virtue of the fact that its students received Basic Education Opportunity Grants and Guaranteed Student Loans. Both are programs which are financed with federal funds and which are used by students to help pay for their educational expenses.

An administrative law judge held that HEW could withhold the funds under the grant and loan programs until the college signed the assurance of compliance form. The college sought to have this ruling overturned. In *Grove City*, the court wrote a wide-ranging opinion, touching on numerous matters. The court was not directly faced with the question faced by this court—whether HEW's power to promulgate and enforce regulations is limited to specific education programs and activities which receive direct federal financial assistance. This question was never answered in *Grove City*. Rather, the court was called upon to decide whether the students' receipt of federally assisted grants and loans constituted federal financial assistance to the college. This distinguishes *Grove City* from the instant case. Moreover, to the extent that *Grove City* is read to endorse an institutional approach, this court rejects that notion for the reasons enumerated in this opinion.

that case authority interpreting Title IX is consistent with the program's specific language of the Act and supports the interpretation of the Act announced today by the court. Since none of the school system's athletic programs have received any federal financial assistance, the regulations promulgated under Title IX cannot reach those programs. HEW's regulations respecting athletics are overbroad and invalid to the extent that they apply to athletic programs or activities which do not receive direct federal financial assistance. Therefore, since, in this case, none of the athletic programs or activities of the defendant receives direct federal financial assistance, neither Title IX nor the HEW regulations provides a legal basis upon which the plaintiff can maintain an action against the defendant.

## IV

It is argued by the plaintiff that Title IX was modeled on Title VI, §§ 601, 602, of the Civil Rights Act of 1964, codified at 42 U.S.C. §§ 2000d, 2000d–1 [hereinafter cited as "Title VI" or 42 U.S.C. §§ 2000d, 2000d–1], and that the decisions interpreting Title VI should be used as the basis for this decision.

In general, Title IX parallels the provisions of Title VI. As the Supreme Court has noted, "Except for the substitution of the word 'sex' in Title IX to replace the words 'race, color, or national origin' in Title VI, the two statutes use identical language to identify the benefited class." *Cannon v. University of Chicago,* 441 U.S. 677, 694–95, 99 S.Ct. 1946, 1956–57, 60 L.Ed.2d 560 (1979). Title VI is programmatic in nature, both in its general scope and in its enforcement provision.[14]

Since Title VI did serve as the model for the drafters of Title XI and contains similar language, judicial interpretations of Title VI are relevant to a determination of the breadth of Title IX. 441 U.S. at 694–95. However, the decisions cited by the plaintiff which broadly construe Title VI are predicated upon a different analytical framework and are decided with a different

level of judicial scrutiny than are the decisions decided under Title IX. Racial discrimination respecting acceptance or admission into educational institutions permeates all programs and activities within those institutions. Once racially discriminatory admission policies have been found to exist, the taint of racial discrimination affects all programs and activities within the particular institution. Therefore, the courts which have decided suits brought under Title VI did not have to carefully focus upon the institutional/programmatic conflict which is now squarely before this court.

■ Charges which allege sex discrimination against an educational institution or system regarding only one program or activity force the court to look with more particularity at the "program and activity" language of Title IX than is required where a charge of racial discrimination has been made against the institution as a whole. Once the court recognizes that there is no charge of system-wide or institution-wide illegal sex discrimination respecting admission or access to all programs and activities generally, then, under Title IX, the court is required to carefully evaluate the allegations to see whether the particular education program or activity being implicated receives direct federal financial assistance. Since most Title VI cases that have enforced agency regulations respecting termination of federal financial assistance have involved racial discrimination on an institution-wide basis, the various courts' affirmances of full funding cut-offs in those cases are not helpful to indicate ways in which the court should respond in this kind of case.

In *U. S. v. Jefferson County Bd. of Ed.,* 372 F.2d 836 (5th Cir. 1966), *cert. denied,* 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103 (1967), the Court of Appeals for the Fifth Circuit was called upon to decide the validity of a desegregation plan. The court never specifically addressed the institutional/programmatic conflict. 372 F.2d at 882. While the court discussed Title VI in its opinion, the holding was, in large part,

14. See 42 U.S.C. §§ 2000d and 2000d–1.

based upon an application of the Constitution. 372 F.2d at 845–46, 847–48, 883, 894.

In *Bob Jones University v. Johnson*, 396 F.Supp. 597 (D.S.C.1974), *aff'd mem.*, 529 F.2d 514 (4th Cir. 1975), the University sought to enjoin an administrative law judge's ruling that the university's racially discriminatory policies permitted the Veteran's Administration to terminate the right of eligible veterans seeking an education at Bob Jones to receive veteran's benefits. The school had a policy of refusing to admit single nonwhites and of expelling students who engaged in interracial dating. The administrative law judge's ruling was upheld when the court determined that the veteran's benefits to Bob Jones students constituted federal financial assistance to the university within the meaning of Title VI. The court did not have to decide which university programs or activities were racially discriminatory because all programs were tainted.

Perhaps the most illuminating and thoughtful opinion construing Title VI determined that the Act was programmatic in nature. In *Board of Public Instruction of Taylor County v. Finch*, 414 F.2d 1068 (5th Cir. 1969), the agency had determined that the county was not moving swiftly enough toward desegregation and, as a result, it terminated all federal funds which the county received in all programs. In overturning HEW's system-wide termination of all federal funds, the court held that the terminations of federal funds had to be keyed to programs or activities—or parts thereof—which received federal funds and which were racially discriminatory. The court determined that Title VI was programmatic in nature.

> The statute prescribes a policy of disassociation of programs in the fact finding process. Each must be considered on its own merits to determine whether or not it is in compliance with the Act. In this way the Act is shielded from a vindictive application. Schools and programs are not condemned enmasse or in gross, with the good and the bad condemned together, but the termination power reaches only those programs which would utilize federal money for unconstitutional ends.

Under this procedure each program receives its own "day in court." 414 F.2d at 1078.

*See* Kuhn, *Employment and Athletics*, 65 Geo.L.J. at 68, which states:

> An examination of *Board of Public Instruction of Taylor County v. Finch*, however, suggests that HEW failed to recognize the implication of the Fifth Circuit's decision. In *Taylor County*, HEW argued that the term "program" in the statute did not refer to individual grant statutes, but to general categories such as road programs and school programs. The court expressly rejected HEW's interpretation. It observed that the legislative history provided lists of programs to be covered by Title VI, and that those lists referred to particular grant statutes, not to a collective concept known as a school program or a road program. (Footnotes omitted).

*See also* Note, *Impact on Private Education*, 65 Ky.L.J. at 691:

> It is strange that HEW would rely on *Finch* for its authority, since this case fully supports the position that only programs which receive federal assistance directly are subject to HEW guidelines. The court in *Finch* was interpreting section 602 of Title IX. Section 602 establishes that "termination [of federal funds] ... shall be limited in its effect to the particular program, or part thereof, in which such noncompliance has been so found." HEW attempted to terminate funds for an entire school district in Florida when only particular schools and programs had violated the HEW regulations. The court refused to give a broad interpretation to the statute, and held that under Title VI "[t]he [termination] action of HEW in the proceedings below was clearly disruptive of the legislative scheme." Instead, "termination of funds under Title VI of the Civil Rights Act must be made on a program by program basis ...."

\*   \*   \*   \*   \*   \*

In light of the stricter standard applied to racial discrimination than sex discrimination, this holding has even more validity

for the Title IX regulations. (Footnotes omitted.)

In short, the plaintiff's use of analogy between Title VI and Title IX is unpersuasive because the problems presented to the courts have been different. While attempting to show that courts have broadly applied regulations promulgated under Title VI and that similar treatment should be accorded regulations passed under Title IX, the plaintiff has failed to recognize the different analytical framework presented by cases brought under the two Acts. Cases decided under Title VI often have had constitutional underpinnings above and beyond the statutory bases. Moreover, often the alleged racial discrimination in question was found to have permeated *all* programs and activities of the system or institution under inquiry. Therefore, many times the court never addressed the institutional/programmatic distinction so crucial to the outcome of this case. Simply put, cases cited by the plaintiff, decided under Title VI, did not have the institutional/programmatic dichotomy squarely at issue as has defendant's motion in this case. *See* Kuhn, *Employment and Athletics*, 65 Geo. L.J. 49, 70 (1976).

The court need not specifically address each Title VI case cited by the plaintiff. This is not a Title VI case. The court merely concludes that, to the degree Title VI cases have construed issues which bear on Title IX, the differences in approach and focus courts must take in construing the two acts, and the different levels of judicial scrutiny applied to racial discrimination cases as contrasted with sexual discrimination cases, create significant distinctions, notwithstanding the similar language contained in the respective statutory schemes. *See* Comment, *Ultra Vires Challenges*, 1976 B.Y.U.L.Rev. at 165; Note, *Impact on Private Education*, 65 Ky.L.Rev. at 668-80.

V

■ Plaintiff argues that the school board receives federal impact aid which is put into the general fund and that this benefits the athletic program. The court rejects the plaintiff's argument that the federal impact aid received by the defendant school board brings it within the ambit of Title IX by virtue of the benefit derived by the athletic programs. Federal impact aid received by a school district does not constitute the type of federal financial assistance to a specific education program or activity envisioned by Title IX; direct federal financial aid to specific education programs or activities is required before the strictures of Title IX can be applied.

Federal impact aid, by definition and by virtue of its purpose, is general and non-program specific. Title 20 U.S.C. § 236 provides:

§ 236. Congressional declaration of policy

In recognition of the responsibility of the United States for the impact which certain Federal activities have on the local educational agencies in the areas in which such activities are carried on, the Congress declares it to be the policy of the United States to provide financial assistance (as set forth in this subchapter) for those local educational agencies upon which the United States has placed financial burdens by reason of the fact that—

(1) the revenues available to such agencies from local sources have been reduced as the result of the acquisition of real property by the United States; or

(2) such agencies provide education for children residing on Federal property; or

(3) such agencies provide education for children whose parents are employed on Federal property; or

(4) there has been a sudden and substantial increase in school attendance as the result of Federal activities.

Under the provisions of 20 U.S.C. §§ 237–41, the federal government compensates schools for the loss of tax revenues that result from the presence of federal installations in the school district and for the added expense of educating children entering the district as a result of federal activity. Such aid is indirect in nature. The court's position with respect to federal impact aid is inconsistent with the program specific guidelines set out in *Romeo*.

The uncontroverted affidavit by the Deputy Superintendent for Business and Fi-

nance of the Ann Arbor Public Schools, William Wade, states that the amount of federal impact aid funds received by the district for 1979 amounted to twelve-hundredths of one percent (0.12%) of the total budget. This *de minimis* percentage of the district's total operating budget cannot form the basis for invocation of Title IX. *See Stewart v. New York Univ.*, 430 F.Supp. 1305 (S.D.N.Y.1976); Kuhn, *Employment and Athletics*, 65 Geo.L.J. at 71–73. The athletic program is not assisted by impact aid.

\* \* \* \* \* \*

For the reason therefore that there is no obligation under the law for the defendant to establish a golf team for girls, the plaintiff's daughters were not excluded from participation nor denied benefits nor discriminated against. Since that is the case, the plaintiff has not achieved anything in this case that the law could give. The plaintiff could not have prevailed under the law and, therefore, no attorney fees should be awarded.

Request for attorney fees is denied.

So ordered.