Tina BENNETT, et al.

v.

WEST TEXAS STATE UNIVERSITY, et al.

Civ. A. No. CA2–80–0073–F.

United States District Court, N. D. Texas, Amarillo Division.

July 27, 1981.

Betty Wheeler, Hoffman, Steeg & Wheeler, Amarillo, Tex., for plaintiffs.

Alan B. Jones and Harlow Sprouse, Underwood, Wilson, Berry, Stein & Johnson, Amarillo, Tex., Edna I. Ramon, Asst. Atty. Gen., Austin, Tex., for defendants.

## MEMORANDUM ORDER GRANTING SUMMARY JUDGMENT

ROBERT W. PORTER, District Judge.

The named Plaintiffs in this action are six female students at West Texas State University in Canyon, Texas, who participate in the University's intercollegiate athletics program. The Defendants are the University as well as various individuals who are responsible for the administration of the University's affairs, including but not limited to the intercollegiate athletics program.

The Plaintiffs, on behalf of themselves and as representatives of the class that has heretofore been certified, have alleged that the Defendants maintain various policies and practices which discriminate against women on the basis of sex and which deny women equal opportunity in the University's intercollegiate athletics program. The Plaintiffs contend that such policies and practices have had the effect of excluding Plaintiffs from full participation in, denying Plaintiffs the benefits of, and subjecting Plaintiffs to discrimination in an athletic program or activity receiving federal financial assistance, and thus that such policies and practices are in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq. (hereinafter Title

IX) and the regulations promulgated thereunder, 34 C.F.R. § 106.1 et seq. (originally codified at 45 C.F.R. § 86.1 et seq.).

It is the Defendants' position that the intercollegiate athletics program does not receive federal financial assistance, and therefore that the program is outside the scope of Title IX. The Defendants also contend that, to the extent the referenced regulations purport to apply to the University's intercollegiate athletic program irrespective of the absence of direct federal financial assistance to that specific program, those regulations are beyond the statutory authority granted under Title IX and are invalid.

The Defendants have filed a motion for summary judgment, to which the Plaintiffs have duly responded. After hearing and careful consideration of the briefs and arguments of counsel, I am of the opinion, for the reasons set out below, that the Defendants are entitled to summary judgment as a matter of law.

### I.

The portion of Title IX at issue here is Section 901 of the Education Amendments of 1972, 20 U.S.C. § 1681, which provides in pertinent part, that

(a) No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance....

The regulations, 34 C.F.R. § 106.1, which have been promulgated by the Department of Education pursuant to Title IX, provide as follows:

(a) General. No person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against in any intercollegiate, club, or intramural athletics offered by a recipient, and no recipient shall provide any such athletics separately on such basis. (emphasis added).

The resolution of Defendants' motion for summary judgment is dependent upon the meaning and effect of these two provisions and their relationship to one another. The Defendants have argued that the exact language of Title IX itself is controlling and, thus, that only if an athletic program or activity directly receives federal financial assistance must there be no discrimination. This is what has been referred to as the "programmatic approach." Plaintiffs assert, to the contrary, that what is prohibited is "institutional" discrimination, i. e., that if an institution receives federal funds, then there may not be any discrimination in any of its programs or activities, regardless of whether that program or activity itself receives the federal aid. This is the approach taken by the regulations.

## II.

An examination of the various sections of Title IX indicates that the drafters of this legislation were very aware of the distinction between the programmatic and institutional approaches. For example, 20 U.S.C. § 1682, the provision by which the agency and the courts are to determine the permissible scope of any regulations instituted to effectuate Title IX, limits the agency's authority to promulgate rules and regulations to include only those programs or activities receiving federal financial assistance:

> Each federal department ... which is empowered to extend Federal financial assistance to any education program or activity ... is authorized and directed to effectuate the provisions of section 1681 of this title *with respect to such program or activity* by issuing rules, regulations, or orders. (emphasis added).

Section 1682 also contains an enforcement provision which provides for termination of federal financial assistance, which is limited to particular programs or activities which receive federal funds. These provisions obviously embody a programmatic approach and should be contrasted with the institutional approach used elsewhere in the same title. 20 U.S.C. § 1684, dealing with impaired vision, states that:

> No person in the United States shall, on the ground of blindness or severely impaired vision, be denied admission in any course of study by a *recipient* of Federal financial assistance for any education program or activity. (emphasis added).

The precise selection of the terms "programs" and "recipient" throughout the various sections of Title IX evidence the clear intent of Congress that Sections 1681 and 1682 and the regulations thereunder apply only to specific programs or activities which receive direct financial assistance.

A review of the legislative background of Title IX supports this conclusion. The original Senate version of Title IX was institutional in nature. It provided that

> No person in the United States shall, on the ground of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity conducted by a public institution which is a recipient of Federal financial assistance for any education program or activity.

117 Cong.Rec. 30156 (1971). This version of Title IX was subsequently rejected and in its stead the present program specific version was enacted. Again, this is clear evidence of the intent of Congress to limit the scope of Title IX.

The courts which have grappled with this issue have ruled consistently with the Congressional interpretation. Most persuasive to this Court in the Fifth Circuit's holding in *Dougherty County School System v. Harris*, 622 F.2d 735 (5th Cir. 1980). In that case the Secretary of Health, Education and Welfare had promulgated regulations which prohibited any school receiving federal financial assistance from engaging in sexual discrimination in employment practices. The regulations were not limited to those employees who were compensated out of federal funds or who worked in programs receiving federal assistance, but they applied to all employees of the entire school system so long as any program or activity of the school received federal financial assistance. The court found the regulations invalid, emphasizing that:

[w]e. cannot find sanction in the statute for this conclusion that any discrimination in an entire school system so taints the system as to permit termination of all federal aid even though federally assisted programs are administered impeccably. The regulations attempt to regulate sex discrimination in employment practices generally rather than in connection with specific programs receiving federal funds. The statute itself indicates that such regulations sweep too broadly. . . . Further evidence that the regulations must be keyed to a specific program is found in the enforcement provisions.

622 F.2d at 737. *Accord, Seattle University v. Department of Health, Education and Welfare,* 16 F.E.P. 719 (W.D.Wash.1978), *aff'd* 621 F.2d 992 (9th Cir. 1980), *cert. granted sub. nom. United States Department of Health, Education and Welfare v. Seattle University,* 449 U.S. 1009, 101 S.Ct. 563, 66 L.Ed.2d 467 (1981); *Romeo Community Schools v. Department of Health, Education and Welfare,* 438 F.Supp. 1021 (E.D. Mich.1977), *aff'd,* 600 F.2d 581 (6th Cir.), *cert. denied* 444 U.S. 972, 100 S.Ct. 467, 62 L.Ed.2d 388 (1979); *Junior College District of St. Louis v. Califano,* 597 F.2d 119 (8th Cir.), *cert. denied* 444 U.S. 972, 100 S.Ct. 467, 62 L.Ed.2d 388 (1979); *Islesboro School Committee v. Califano,* 593 F.2d 424 (1st Cir.), *cert. denied* 444 U.S. 972, 100 S.Ct. 467, 62 L.Ed.2d 387 (1979). The Fifth Circuit's determination that Title IX governs the conduct of a program only if that specific program receives Federal financial assistance is binding on this court.[1] The clear language of Title IX and the intent of Congress require that the Act be applied programmatically. To the extent that the regulations attempt to apply the strictures of Title IX on an institutional basis, the regulations are invalid.

### III.

■ Although I have held that Title IX is applicable only to those specific programs and activities which receive direct federal assistance, Plaintiffs contend that there is a genuine issue of fact as to whether the University's athletic programs receive direct federal aid. Clarence E. Thompson, the Business Manager and Chief Financial Officer of West Texas State University, has submitted an affidavit which asserts that the intercollegiate athletics program maintained by the University does not receive any direct financial assistance of any nature from the federal government. The Plaintiffs argue, however, that various depositions taken in the case reflect that the athletic programs benefit from the fact that students receive veteran's benefits, Basic Educational Opportunity Grants, federal work-study program benefits and other federal financial aid. Plaintiffs also assert that the university receives federal aid for building dormitories and dining halls which particularly benefit athletes. Plaintiffs' contention is, in essence, that the athletic programs of the University are directly benefited by federal financial assistance because those programs receive funds that would otherwise be diverted without the infusion of federal monies.

Plaintiffs' argument that such aid constitutes a direct benefit to the athletics programs is not well-taken. All the types of federal aid enumerated by the Plaintiffs

---

1. Most of the cases interpreting Title IX have arisen in the context of challenges to regulations under Title IX relating to employment discrimination. I am aware of only one other court that has been directly confronted with the difficult and sensitive task of applying Title IX and its regulations to a school's athletic programs. *Othen v. Ann Arbor School Board,* 507 F.Supp. 1376 (E.D.Mich.1981). Judge Joiner's analytical opinion cogently addresses issues identical to ones raised in the case at bar, and I unreservedly endorse his reasoning and holding.

Of particular import to my holding here is Judge Joiner's analysis of the relationship between Title IX and Title VI of the Civil Rights Act of 1964. While recognizing that the Supreme Court has held in *Cannon v. University of Chicago,* 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), that Title IX is to be construed in accordance with Title VI, Judge Joiner relied heavily on *Board of Public Instruction of Taylor County v. Finch,* 414 F.2d 1068 (5th Cir. 1969), in holding that Title IX is programmatic in nature. *Finch,* which held that Title VI is programmatic in nature, is of course binding authority on this Court.

are general and nonspecific, and such aid is indirect by nature. The type of assistance relied on by Plaintiffs results in some benefit, however remote and indirect, to every program at West Texas State University. Were the Court to adopt Plaintiffs' argument, the programmatic construction of Title IX would be rendered nugatory, because every program or activity at the university would be subject to Title IX. The Act itself compels a different conclusion. In order for the strictures of Title IX to be triggered, the federal financial assistance must be direct. *Othen v. Ann Arbor School Board*, 507 F.Supp. 1376 (E.D.Mich.1981); *Stewart v. New York University*, 430 F.Supp. 1305 (S.D.N.Y.1976). The type of indirect aid received by the University athletic programs does not bring them within the ambit of Title IX.

### IV.

Therefore, in accordance with the foregoing opinion, it is

ORDERED that Defendants motion for summary judgment be and hereby is in all things GRANTED.