UNIVERSITY OF RICHMOND

v.

Terrell H. BELL, et al.

Civ. A. No. 81–0406–R.

United States District Court,
E. D. Virginia,
Richmond Division.

July 8, 1982.

Robert H. Patterson, Jr., W. Carter Younger, Eva S. Tashjian-Brown, McGuire, Woods & Battle, Richmond, Va., for plaintiff.

Debra J. Prillaman, Asst. U. S. Atty., Richmond, Va., for defendant.

## OPINION

WARRINER, District Judge.

### I

The refusal of the University of Richmond (UR) to cooperate with a Department of Education (ED) investigation of its athletic program gives rise to a suit in which the Court must determine the validity of and scope of several ED regulations promulgated pursuant to Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.* (Title IX). *See* 34 C.F.R. § 106.1 *et seq.* (1981). At issue is whether the ED is authorized to investigate and regulate the athletic program of a private university where the athletic program itself receives no direct federal financial assistance.

The University of Richmond is a private university consisting of several separate schools and colleges, among which are two coordinate undergraduate liberal arts colleges: Richmond College for men and Westhampton College for women. Although students from both colleges attend most classes together, the two schools maintain separate admissions, hold separate graduation exercises, maintain separate tra-

ditions and provide many auxiliary services separately. The athletic department, on the other hand, offers intercollegiate and club sports for both men and women. The athletic department is funded separately from other programs at the University based on a budget drawn from sports revenues and gifts and the general funds of the University. It receives no direct federal financial assistance.

By a letter dated 6 February 1981, defendant Dewey E. Dodds, Director of the Office of Civil Rights (OCR), Region III, United States Department of Education, notified the University that OCR had received a complaint of sex discrimination in the University's athletic program. Dodds stated that OCR had reviewed the allegations and determined OCR had the authority to investigate the complaint. OCR's "determination" of authority to investigate UR's athletic program was based, according to the letter, upon the University's receipt of a $1900 Library Resource Grant.[1] The University, by counsel, responded to Dodds' letter by requesting clarification of OCR's intent and questioning the propriety of the OCR investigation.[2]

In a letter dated 27 February 1981, Dodds informed UR's president that the University had been selected for a "Title IX compliance review addressing its intercollegiate athletic program," and that OCR was planning a week-long on-site review of the intercollegiate athletic program. In connection therewith, he requested the University answer a lengthy information request within 30 days.[3] This letter was, in turn, followed by another dated 4 March 1981 in which Dodds reiterated OCR's duty to investigate complaints of discrimination within the purview of plaintiff's authority, and stating that OCR was in receipt of two such complaints.

The University's response of 14 March 1981 questioned OCR's jurisdiction to conduct the investigation as the athletic program at UR did not receive federal funds and therefore would not be within the reach of Title IX. It also noted that the information request was unduly lengthy, burdensome, possibly in excess of OCR's investigative authority, and a form request which had not been submitted for prior approval to the Office of Management and Budget as provided in 42 U.S.C. § 3509.[4]

Dodds, in turn, responded to this letter on 31 March 1981. Therein, as the basis for OCR's authority, Dodds asserted that UR's receipt of any federal funds at all, directly or indirectly, required its compliance with the anti-discrimination provisions of Title IX in all its educational programs and activities, including athletics. Dodds indicated that the federal financial assistance extended to the University for academic year 1980–81 included: National Direct Student Loans, Basic Educational Opportunity Grants, Supplemental Educational Opportunity Grants, College Work Study, Department of Education Grant.[5] After setting

1. The University had received grants under the College Library Resources program, 20 U.S.C. § 1029, in the amount of $1,900 (1980–81) and $1,200 (1981–82). By statute, the funds were used exclusively to purchase eligible library materials.

2. OCR had completed two months previously an 18-month investigation of the University's graduate professional schools which had resulted in a determination that they were in full compliance with Title IX, as well as Title VI of the Civil Rights Act of 1964 and § 504 of the Rehabilitation Act of 1973. In 1979, the University also had been visited by a team of OCR officials reviewing proposed guidelines and regulations on athletics under Title IX. However, prior to February, 1981, OCR had conducted no investigation of UR's athletic program, itself.

3. The information request covered all aspects of the intercollegiate athletic program including *inter alia*: budgets, policies, practice schedules, modes of transportation, and lists of all teams, locker rooms, weights and training facilities.

4. Dodds initially denied that the "request" was a form stating instead that it "was written for this particular investigation..." (Stip.Exh. G). He later admitted that it was a form request used verbatim and not previously approved by OMB. (Dodds' depo. p. 61, 11.1–9 and p. 62, 11.16–21).

5. Dodds was explicit about OCR's authority to investigate the University's athletic program under Title IX. In the letter he stated:
   Whether a particular education program or activity directly receives Federal funds is not

out these five sources of assistance Dodds continued:

> Although most of this Federal financial assistance is paid directly to the students, receipt of the Federal funds is conditioned upon enrollment of the student at an approved institution of higher education. In this sense, the institution is ultimately the beneficiary of the Federal funds which enable students to attend the institution in the first instance and to pay tuition and other educational expenses. Therefore, not only by virtue of the direct grants extended to the University of Richmond, but also the receipt of Federal funds by its students, the University must comply with the anti-discrimination provisions of Title IX in all its educational programs and activities, including athletics.

Dodds cautioned that failure to comply with the information request would result in the matter's referral for enforcement proceedings. (Stip. Exh. G). The University subsequently filed this action seeking injunctive and declaratory relief, and informed OCR of its refusal to comply with the data request. Pending a decision in this action OCR has not pressed for access to the University for the planned on-site investigation.

The parties have filed a joint stipulation of fact and have submitted the matter for a decision on the merits through cross-motions for summary judgment. Both motions, fully briefed, are ripe for consideration.

The Court has jurisdiction over this suit for declaratory and injunctive relief pursuant to Title IX, 20 U.S.C. § 1683. Relief is sought under the Administrative Procedures Act, 5 U.S.C. § 701 *et seq.* and the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 & 2202; 28 U.S.C. § 1331.

### II

Congress, in 1972, enacted legislation which "proscribe[d] gender discrimination in education programs or activities receiving Federal financial assistance." 20 U.S.C. § 1681; *North Haven Board of Education v. Bell*, —— U.S. ——, 102 S.Ct. 1912, 72 L.Ed.2d 299 (1982). Section 901 of Title IX provides:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance. . . ."

20 U.S.C. § 1681.

Section 902 authorizes agencies awarding federal financial assistance to education programs or activities to effectuate the provisions of section 901 "with respect to such program or activity" by promulgating rules and regulations of "general applicability" which are "consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken." Compliance may be effected by any means authorized by law including fund cutoffs to the "recipient" but the effect thereof "shall be limited in its effect to the particular program . . . in which . . . non compliance has been found." 20 U.S.C. § 1682. Since 1975, HEW and the ED have promulgated numerous regulations affecting the operation of federally funded education programs. The regulations extend to policies involving employment, admissions, housing, textbooks and athletics. They cover almost every aspect of the operation of a university. *See* 34 C.F.R. § 106.1 *et seq.* [6]

Plaintiff, in brief, argued that Title IX is "program specific" and should apply only to

---

determinative of the coverage of that program or activity by Title IX. Rather, the determination is based on whether the "recipient" institution receives, either directly or indirectly, "Federal financial assistance" which benefits its programs and activities. *See Bob Jones University v. Johnson*, 396 F.Supp. 597 (D.S.C.1974), *aff'd per curiam*, 529 F.2d 514 (4th Cir. 1975); *Grove City*

*College v. Harris*, 500 F.Supp. 253 (W.D.Pa. 1980)."

**6.** HEW's functions under Title IX were transferred in 1979 to the Department of Education by Section 301(a)(3) of the Department of Education Organization Act, Pub.L. 96–88, 93 Stat. 678, 20 U.S.C. § 3441(a)(3).

"education program[s] or activit[ies]" receiving *direct* federal financial assistance. Plaintiff contended that ED's regulations are ultra vires and unlawful to the extent that they attempt to regulate programs which do not receive such direct funding. Such regulations, in plaintiff's view, violate Title IX's statutory mandate and are void. Moreover, plaintiff argued that the regulations are unconstitutional in that they unreasonably restrict academic freedom and are not the least restrictive alternative available.

Defendants took a position diametrically opposed to plaintiff, ascribing an "institutional" scope to Title IX. Stressing that a Court should defer to an agency's interpretation of implementing legislation, the defendants argue that the statute and the regulations passed thereunder are such that a university, as "recipient" of any federal financial assistance, is subject to regulation by OCR. *See* 34 C.F.R. §§ 106.2, 106.11, 106.37, 106.41. Their contention is that some programs at UR receive federal financial assistance and, as a consequence, all programs, including the athletic program, are subject to Title IX regulation. The breadth of the ED's view as to the scope of its authority was unequivocally set out both in Dodds' letter of 31 March 1981, and in his deposition whereby he suggested that the receipt of $1.00 by any program or activity at UR would subject all its programs and activities to the ED's authority.

In the alternative, the ED argues that the University is bound contractually to comply with the regulations through its execution of an "Assurance of Compliance" on 26 September 1976, in connection with the receipt of federal financial assistance from HEW. *See* (Stip. Exh. A(1)); 34 C.F.R. § 106.4.[7] Defendants concede that plaintiff's obligation to comply with the assurances extends only so far as the valid regulatory authority of the ED. They argue, however, that the present breadth of scope was extant when plaintiff signed the agreements and it should be foreclosed to deny knowledge of that scope as a means of avoiding its obligations thereunder.

The Supreme Court, subsequent to the filing of briefs, determined the scope of Title IX to be "program-specific" both as to its prohibition of gender discrimination, 20 U.S.C. § 1681(a), and as to its enforcement provision under which ED has promulgated its regulations. 20 U.S.C. § 1682. *North Haven Board of Education v. Bell*, —— U.S. ——, —— – ——, 102 S.Ct. 1912, 1925–1927, 72 L.Ed.2d 299 (1982). In *North Haven Board of Education v. Bell, supra*, the Court addressed an analogous challenge to the applicability of ED's regulations covering employment practices. In so doing, the Court rejected the institutional approach pressed by the ED in this case. Quoting that portion of Section 902 authorizing the issuance of implementing regulations,[8] the Court continued:

> Certainly, it makes little sense to interpret the statute, as respondents urge, to authorize an agency to promulgate rules that it cannot enforce. And § 901(a) itself has a similar program-specific focus: 'it forbids gender discrimination under any education program or activity receiving Federal financial assistance....'
>
> Title IX's legislative history corroborates its general program-specificity. Congress failed to adopt proposals that would have prohibited all discriminatory practices of an institution that receives federal funds. *See* 117 Cong.Rec. 30155–30157, 30408 (1971) (Sen. Bayh's 1971 amendment); H.R. 5191, 92d Cong., 1st

---

7. Defendants also rely on plaintiff's signature in 1979 and 1981 to Program Participation Agreements in which they bound themselves to comply with Title IX. *See* (Stip.Exh.'s A(2) and A(3)).

8. Section 902 provides:
   Each Federal department and agency which is empowered to extend Federal financial assistance to any education program or activity ... is authorized and directed to effectuate the provisions of Section 901 with respect to such program or activity by issuing rules, regulations or orders of general applicability which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken.

Sess., § 1001(b) (1971) (administration proposal); 1970 Hearings 690–691 (Dept. of Justice's proposed alternative to § 805 of H.R. 16098); cf. Title IX, § 904 (proscribing discrimination against the blind by a recipient of federal assistance with no program-specific limitation). In contrast, Senator Bayh indicated that his 1972 amendment, which in large part was ultimately adopted, was program-specific. *See* 118 Cong.Rec. 5807 (1972) (observing that the amendment 'prohibit[s] discrimination on the basis of sex in federally funded education programs,' and that '[t]he effect of termination of funds is limited to the particular entity and program in which such noncompliance has been found. . . .'); cf. 117 Cong.Rec. 39256 (1971) (colloquies between Reps. Green and Waggoner and between Reps. Green and Steiger). Finally, we note that language in §§ 601 and 602 of Title VI, virtually identical to that in §§ 901 and 902 and on which Title IX was modeled, has been interpreted as being program-specific. *See Board of Public Instruction v. Finch*, 414 F.2d 1068 (5th Cir. 1969). We conclude, then, that an agency's authority under Title IX both to promulgate regulations and to terminate funds is subject to the program-specific limitation of §§ 901 and 902. Cf. *Cannon v. University of Chicago*, 441 U.S. at 690–693 [99 S.Ct. at 1954–1955].

—— U.S., at ——, 102 S.Ct., at 1926.

The Court, however, refused to void the regulations as had been done by several courts of appeals. Rather, the Court determined that the admittedly general terms of the regulations in question were constrained by the limiting language of the introductory regulation which the Court construed as being program-specific. *See* 34 C.F.R. § 106.1 (1980), *construed in North Haven Board of Education v. Bell, supra*, at ——, 102 S.Ct. at 1926. Because the same regulation applies here, this Court is hesitant to void the regulations if, without voiding, it can reach a conclusion similar to that reached in *North Haven*.[9]

The Court in *North Haven* did not resolve what is meant by Title IX's reference to an "education program or activity receiving Federal financial assistance." The issue of funding was not before the Court and it did not rule as to what might constitute the receipt of federal financial assistance. The Court, in support of its program specific ruling, quoted language from *Board of Public Instruction of Taylor County, Florida v. Finch*, 414 F.2d 1068, 1078 (5th Cir. 1969), to the effect that the ED regulations would apply to a "[program or activity that] receives or benefits from [federal financial] assistance," —— U.S. at ——, 102 S.Ct. at 1927. The Court devised no nexus test for determining when a non-direct recipient program is nevertheless "benefitting" from federal assistance so as to bring it within the Court's program-specific ruling but, in dicta, the Court did indicate that such assistance would have to go either directly to a program or be closely associated with it. The Court noted that "[n]either school board opposed HEW's investigation into its employment practices on the grounds that the complaining employee's salaries were not funded by federal money, that the employees did not work in an education program that received federal financial assistance, or that the discrimination they allegedly suffered did not affect a federally funded program." In the quoted language,

---

9. Plaintiffs in arguing that the regulations are void relied on a series of cases wherein courts had rejected Title IX applicability to employees and struck down regulations passed pursuant thereto. The Supreme Court's recent rulings in *North Haven* and several of the cases on which plaintiff relied suggest a more careful approach to the ED regulations by this Court. *See Seattle University v. HEW*, 621 F.2d 992 (9th Cir. 1980) *vacated* ·· U.S. ——, 102 S.Ct. 2264, 73 L.Ed.2d 1280 (1982); *Dougherty County School System v. Harris*, 622 F.2d 735 (5th Cir. 1980), *vacated* ·· U.S. ——, 102 S.Ct. 2264, 73 L.Ed.2d 1280 (1982); *Romeo Community Schools v. HEW*, 600 F.2d 581 (6th Cir.) *cert. denied*, 444 U.S. 972, 100 S.Ct. 467, 62 L.Ed.2d 388 (1979). Although *Seattle* and *Dougherty* were both vacated and remanded following the Supreme Court's decision in *North Haven*, their reasoning as to the issue of program specificity is still valid in that their failing, if any, was the invalidation of the Department of Education regulations rather than the mere restriction.

there is no mention of the "benefits" alternative of *Finch*. Thus *North Haven*, other than its direct *Finch* quote, suggests no broadened definition of "program or activity receiving Federal financial assistance." [10]

■ Upon careful consideration of the briefs, stipulated facts, and relevant authority, the Court concludes that Title IX does not authorize the ED to investigate or regulate the athletic program at the University of Richmond. The ED relies on its own regulations as authority for its investigation. While a strained reading of the ED regulations might result in a conclusion that the regulations are not inconsistent with the holding in *North Haven*, a fair reading indicates that the ED has attempted to create an institutional approach in its regulations. Even if this court, mindful of *North Haven*, does not strike down the regulations in toto, it cannot approve the institutional reading of the regulations that has clearly, indeed emphatically, been applied to UR. The ED's practice in this matter under the guise of their regulations is contrary to the language of the governing statute, the intent of Congress in enacting Title IX, and the program specific ruling of *North Haven*.

■ The ED is not aided by the usual deference courts give to agency interpretations of implementing legislation and the regulations promulgated thereunder. Although

> [t]he interpretation put on [a] statute by the agency charged with administering it is entitled to deference, *National Labor Relations Board v. Bell Aerospace*, 416 U.S. 267, 275 [94 S.Ct. 1757, 1762, 40 L.Ed.2d 134] (1974); *Udall v. Tallman*, 380 U.S. 1, 16 [85 S.Ct. 792, 801, 13 L.Ed.2d 616] (1965), . . . the courts are

the final authorities on issues of statutory construction. They must reject administrative constructions of [a] statute . . . that are inconsistent with the statutory mandate or that frustrate the policy that Congress sought to implement. *Security and Exchange Commission v. Sloan*, 436 U.S. 103, 118 [98 S.Ct. 1702, 1711, 56 L.Ed.2d 148] (1978); *Federal Maritime Commission v. Sea Train Lions, Inc.*, 411 U.S. 726, 745–746 [93 S.Ct. 1773, 1784–1785, 36 L.Ed.2d 620] (1973); *Volkswagen Werk v. FMC*, 390 U.S. 261, 272 [88 S.Ct. 929, 935, 19 L.Ed.2d 1090] (1968); *NLRB v. Brown*, 380 U.S. 278–291 [85 S.Ct. 980–988, 13 L.Ed.2d 839] (1965)."

*FEC v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 31–32, 102 S.Ct. 38, 42, 70 L.Ed.2d 23. *See also North Haven Board of Education v. Bell, supra*, —— U.S. at —— n.12, 102 S.Ct. at 1918 n.12. Where the agency's interpretation of the statute conflicts with the language of the statute it undercuts the argument that the regulations promulgated thereunder are entitled to deference as the interpretation of the agency charged with Title IX's enforcement. Id.

■ Similarly, the deference accorded to an agency's interpretation of its own regulations may be withheld when, as here, there is no consistent administrative interpretation of the Title IX regulations to evaluate. *See North Haven Board of Education v. Bell, supra* at —— n.29, 102 S.Ct. at 1927 n.29.[11]

Having failed in its straight-forward lobbying effort to obtain institutional coverage in Congress, the ED has apparently taken the law into its own hands and decided it knows better than Congress. Perhaps they do, but they lack the legislative authority

---

**10.** Lest there be any doubt, this Court construes "benefits" to be a redundancy of the term "financial assistance" much as it determines "activity" to be a redundancy of the term "program." Thus, the reach of Title IX is no greater through the use of the term "benefits" than without. The question in every case should be whether the program or activity receives direct federal financial assistance. If it does then Title IX is applicable, jurisdiction.

**11.** The position of the ED, as previously noted in unreported decisions by this Court, has been anything but consistent. Similar confusion as to the position which the ED wishes to take has also been evident in other cases. *See Grove City College v. Harris*, 500 F.Supp. 253 (W.D. Pa.1980), *appeal pending sub nom Grove City College v. Bell*, Nos. 80–2383/2384 (3d Cir. 1982) (stayed upon ED's motion to allow possible modification to regulations).

under the Constitution to amend acts of Congress. Moreover, delegation of authority pursuant to 20 U.S.C. § 1682 did not authorize the ED to subvert the will of Congress that the programmatic rather than the institutional approach be established.

*North Haven* notwithstanding, defendants' reliance on *Bob Jones University v. Johnson*, 396 F.Supp. 597 (D.S.C.1974), aff'd mem, 529 F.2d 514 (4th Cir. 1975); *Grove City College v. Harris*, 500 F.Supp. 253 (W.D.Pa.1980), *appeal pending sub nom Grove City College v. Bell*, Nos. 80–2383/2384 (3rd Cir. 1982); and *Haffer v. Temple University*, 524 F.Supp. 531 (E.D. Pa.1981), is misplaced. *Bob Jones*, on which both of the other cases rely, involved an action pursuant to Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.* and the United States Constitution. Moreover, the case involved race discrimination in the admissions process, a process which necessarily affected the entire institution. The broad reading in *Bob Jones* is not necessary in this case dealing with Title IX. Title IX lacks the constitutional scope of Title VI. Moreover, in *Mandel v. United States Department of HEW*, 411 F.Supp. 542 (D.Md.1976), *aff'd sub nom, Mayor and City Council of Baltimore v. Matthews*, 571 F.2d 1273 (4th Cir.), *cert. denied*, 439 U.S. 862, 99 S.Ct. 184, 58 L.Ed.2d 171 (1978), the Fourth Circuit affirmed en banc, by an equally divided court, a district court decision in which Title VI was held to be program-specific. *See also North Haven Board of Education v. Bell, supra,* —— U.S. at ——, 102 S.Ct. at 1927, citing *Board of Public Instruction of Taylor County, Florida v. Finch*, 414 F.2d 1068 (5th Cir. 1969) (noting Fifth Circuit's construction of Title VI as being program-specific as indicative that Title IX regulations were to be interpreted in a like fashion).

■ Apparently anticipating the Supreme Court's program-specific *North Haven* ruling, ED advances three other theories as to why it has jurisdiction over the athletic department notwithstanding that UR does not receive federal funds specifically earmarked for athletics. The ED contends initially that the athletic department comes within its jurisdiction because it "benefits" from various funds which are received by the University or other programs which in turn release University funds to be used in the athletic department. This argument has been rejected consistently by the courts which have addressed the issue. *See Rice v. President and Fellows of Harvard College*, 663 F.2d 336 (1st Cir. 1981); *Dougherty County School System v. Harris*, 622 F.2d 735 (5th Cir. 1980), *vacated on other grounds*, —— U.S. ——, 102 S.Ct. 2264, 73 L.Ed.2d 1280; *Othen v. Ann Arbor School Board*, 507 F.Supp. 1376 (E.D.Mich. 1981); *Bennett v. West Texas State University*, 525 F.Supp. 77 (N.D.Tex.1981).

In *Rice v. President and Fellows of Harvard College, supra,* the Court of Appeals for the First Circuit held that receipt of federal funds by a law school for such specific programs as work-study did not create a private cause of action for a person who failed to identify a specific federally funded program in which she suffered discrimination because of her sex. The Court stated that:

[The plaintiff] would have us interpret "education program" in this case to mean Harvard Law School, thereby permitting her to invoke the protection of Title IX. Such an interpretation is essential to her claim, as she has not specified any federally funded program in which she suffered discrimination because of her sex. Her argument is that, by virtue of the Law School's status as a recipient of federal funds through such specific programs as work-study, Title IX applies whenever the school discriminates in any area, regardless of whether discrimination occurs in a program that is federally funded.

663 F.2d at 338.[12]

In *Bennett v. West Texas State University, supra,* six female students brought a

---

12. *See also Stewart v. New York University,* 430 F.Supp. 1305 (S.D.N.Y.1976) (indebtedness to HUD for financial assistance used to construct law school dormitories does not help

Title IX action alleging sex discrimination in the University's intercollegiate athletics program. The Court specifically addressed the "benefits" argument that has been raised by defendants in this case. Having ruled that Title IX was program-specific and applicable only to those programs and activities which "receive direct federal assistance," the court addressed plaintiffs' contention that the athletic programs there benefited from the students receipt of veteran's benefits, Basic Educational Opportunity Grants, Federal Work-Study Program Benefits, and other financial aid. Plaintiffs also asserted that the university received federal aid for building dormitories and dining halls which particularly benefited athletes.

Plaintiffs' contention is, in essence, that the athletic programs of the University are directly benefited by federal financial assistance because those programs receive funds that would otherwise be diverted without the infusion of federal monies.

Plaintiffs' argument that such aid constitutes a direct benefit to the athletics program is not well-taken. All the types of federal aid enumerated by the Plaintiffs are general and non-specific, and such aid is indirect by nature. The type of assistance relied on by Plaintiffs results in some benefit, however remote and indirect, to every program at West Texas State University. Were the Court to adopt Plaintiffs' argument, the programmatic instruction of Title IX would be rendered nugatory, because every program activity at the university would be subject to Title IX. The Act itself compels a different conclusion. In order for the strictures of Title IX to be triggered, the federal financial assistance must be

direct. *Othen v. Ann Arbor School Board*, 507 F.Supp. 1376 (E.D.Mich.1981); *Stewart v. New York University*, 430 F.Supp. 1305 (S.D.N.Y.1976). The type of indirect aid received by the University athletic program does not bring them within the ambit of Title IX.

525 F.Supp. at 80–81.

In *Othen v. Ann Arbor School Board, supra*, where a Title IX suit was brought against the defendant school board alleging that one of plaintiff's daughters was "cut" from the high school team because of her sex, the court also addressed the same interpretive issue as before this Court. The court concluded that Title IX was program-specific and that "since ... none of the athletic programs or activities of the defendant receives direct federal financial assistance, neither Title IX nor the HEW regulations provides a legal basis upon which plaintiff can maintain an action against defendant." 507 F.Supp. at 1387.

■ Defendants also argue that even if the athletic department does not receive financial assistance the ED must be able to ascertain whether other activities or programs at the University which do receive financial assistance have been "infected" by discriminatory practices in the athletic department. At first glance, *North Haven* appears to contemplate such a theory in its language that a defense to Title IX coverage would include an assertion that the offending "discrimination ... allegedly suffered did not affect a federally funded program." —— U.S. at ——, 102 S.Ct. at 1927. However, the Court, as previously noted, relied in part on the Fifth Circuit's decision in *Finch* for its program-specific

plaintiff in her suit alleging discrimination under Title VI, Title IX, and the United States Constitution, since the discrimination did not involve the dormitory). *Flanagan v. President & Directors of Georgetown Col.*, 417 F.Supp. 377 (D.D.C.1976), is not to the contrary. In *Flanagan*, the court gave a broad reading to the relevant HEW regulations under Title VI concluding that the Georgetown Law Center which was itself built with the help of federal financial assistance was subject to Title VI regulation. No such tie exists here.

In addition to the Library Grants and the several student financial aid funds, the ED claims jurisdiction through UR's receipt of two HUD loans used to construct general purpose dormitories. These dormitories are neither designated as athletic dormitories nor do athletes derive benefits therefrom other than being members of the general student population. As no discrimination is alleged as to the dormitories, the instant situation is more in line with *Stewart* than *Flanagan*.

ruling. And, *Finch* was the first case to espouse the infection theory and in so doing rejected its application in a case such as the instant one.

In *Finch*, a Title VI case, plaintiff challenged a fund termination order of HEW. The Court of Appeals, while recognizing that "if [federal funds] support a program which is infected by a discriminatory environment, then termination of such funds is proper," continued stating:

> [t]he statute prescribes a policy of disassociation of programs in the fact-finding process. Each must be considered on its own merits to determine whether or not it is in compliance with the Act. In this way the Act is shielded from a vindictive application. Schools and programs are not condemned enmasse or in gross, with the good and the bad condemned together, but the termination power reaches only those programs which would utilize federal money for unconstitutional ends. Under this procedure each program receives its own "day in court."

414 F.2d at 1078.[13] The distinction between *Finch* and the instant matter is that the infection theory applies when a federally funded program is infected from elsewhere. The focus there is on the funded program. No such allegation has been made here. Conversely, defendants have stipulated that, notwithstanding their own counterclaim, there is no allegation of improprieties in the operation of any of the student financial aid programs at UR.

In essence, the ED's "benefits" and "infection" theories are but theories, or arguments, that Congress should not have rejected the initial institutional approach introduced by Senator Bayh. However, Congress did reject that approach and that should have been the end of it. Nevertheless, the ED has persisted, despite the fact that no circuit court and only two district courts have agreed with them. *See Haffer v. Temple University, supra; Grove City College v. Harris, supra.*

The statute does not justify either the "or benefits" language or the "through another recipient" language of the regulations. 34 C.F.R. § 106.2(g)(1)(ii), as applied here, exceeds the scope of Title IX to the extent that it equates scholarships, loans, grants, wages, or other funds extended for the benefit of students (or their parents) as being "aid" to educational institutions. These funds received by UR from or on behalf of students, and which originate from federal funds are not really " 'federal assistance' [at all] but rather payments for services rendered. Federal judges receive federal salary checks each month but it is not supposed that this is 'assistance'. It is presumed that they are being paid an approximation, at least, of what they should be compensated for judging." *Trageser v. Libbie Rehabilitation Center, Inc.,* 462 F.Supp. 424, 426 (E.D.Va.1977), *aff'd,* 590 F.2d 87 (4th Cir. 1978), *cert. denied,* 442 U.S. 947, 99 S.Ct. 2895, 61 L.Ed.2d 318 (1979). Similarly, UR provides numerous programs, activities and services for which it receives remuneration from its students. Thus the fees paid are compensation for services rendered and as such do not constitute "aid." Moreover, even if such funds could be construed as aid to educational institutions, they do not constitute direct aid to the intercollegiate athletic program. The Court simply will not countenance the ED's attempt to bootstrap itself through its regulations to make, by necessary implication, all programs and activities of a private university subject to its control when any program or activity within the institution, or the institution, or students themselves

---

**13.** In a caveat at the end of the opinion, the court more fully explained the "infection theory" as being one whereby the court in making its program-by-program analysis should nevertheless look at a program in the context in which it exists. Thus, the court directed that the administrative agency "seeking to cut off Federal funds must make findings of fact indicating either that a particular program is itself administered in a discriminatory manner, or is so affected by discriminatory practices elsewhere in the school system that it thereby becomes discriminatory." 414 F.2d at 1079. *See also Othen v. Ann Arbor School Board, supra,* at 1387–1389 (discussing the distinction between Title VI system wide discrimination and Title IX discrimination).

receive what it determines to be "federal financial assistance." *See* 34 C.F.R. § 106.-2(g).

■ In *North Haven Board of Education v. Bell, supra,* the Supreme Court upheld the ED's regulations because it was able to construe them as being program-specific. Quoted language in the opinion suggesting a broader construction must be viewed in light of the Court's ruling, not as a broader grant of authority to ED. Although dictum, the Court's listing of bases to avoid Title IX coverage indicates further the narrow scope of the receipt-of-federal-financial-assistance phrase. Applying the *North Haven* criteria here, there is no evidence or claim that any athletic department employee's salary is deferred by federal funds, there is no evidence or claim that the program itself has received federal assistance, or that the discrimination allegedly suffered has in any way affected any other federally funded program at UR. Further, there is no evidence or claim that any athletic facility was built with federal funds or that athletes, as such, specially benefit from any facilities at UR that did receive federal financial assistance. Defendants have failed entirely to establish a nexus between federal financial assistance and the athletic program at UR.

■ Defendants' final argument is that in order for the ED to enforce its regulations it must be able to conduct the pro-posed extensive investigation to determine whether intercollegiate athletics is a "program or activity" receiving federal financial assistance. This is double-talk and sophistry. Talk of "investigative authority" is simply the same old raccoon with another ring around its tail—an attempt to revive the rejected institutional approach. If correct, then there is no facet or aspect of any activity, program, practice, tradition, usage—*nothing* about an erstwhile private educational institution that is not subject to the suspicious prying eye of the Department of Education. Congress' careful circumscription of that agency's power in Title IX will be for nought if defendants' interpretation is to be countenanced. If the regulations as interpreted by defendant herein are valid, then the Secretary of Education has the authority to investigate. If they are invalid, either on their face or as applied, he lacks the authority in this case.[14]

■ Defendants' assertion that they are entitled to conduct a compliance review of any of the University's programs if only for purposes of "official curiosity," or to determine whether activities in the athletic department "infect" other federally funded programs or activities is without merit. Although the Court in *United States v. Morton Salt,* 338 U.S. 632, 70 S.Ct. 357, 94 L.Ed. 401 (1950), involving the rights of a corporation under the Fourth Amendment, did state that an investigation could be initiat-

14. The investigation argument could perhaps be upheld as genuine, not a subterfuge, were defendants to conform the regulations to the statute. Then the simple question might be whether plaintiffs were improperly siphoning off federal aid from other programs to intercollegiate athletics, or perhaps, whether the coaches were masquerading as physics professors, their coaching salary being disguised as a research grant. But here, defendants base their right to investigate on their predetermined view that since the University of Richmond in some of its programs and activities as a "recipient" then, *for that reason* defendants may investigate all its activities—even those as to which they admit no aid is being given. Defendants' reasons in their brief differ from the reasons they gave when demanding access in OCR's original communications with the University. Their rationalization in brief is but argument whereas the basis for their authority given at the time of their demand is fact. Defendants' argument that they are merely conducting an "investigation" to determine whether the athletic department is subject to Title IX is belied by the correspondence in which the OCR engaged with the University. Therein, they asserted as jurisdiction the regulation concerning athletics which presumes that OCR had already determined jurisdiction over the matter. *See* 34 C.F.R. § 106.41; (Stip.Exh. G). Defendants ought not to behave in such a disingenuous manner. If the regulations are correct defendants ought to fight it out on that line if it takes all summer. But to falsely pretend to the court that the Secretary of Education is just policing around to see if he can turn up anything—in the face of explicit regulations which have, for him, already foreclosed the issue—does not comport with this Court's idea of how the Secretary of Education should conduct himself in litigation.

ed out of "official curiosity" it nevertheless mandated as a prerequisite that such an investigation would be authorized only "if the inquiry is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant." 338 U.S. at 652, 70 S.Ct. at 368. As is apparent even from other authority cited by defendant, no inherent investigatory authority exists in a government agency but only such authority as is granted by statute. Title IX grants no investigatory power itself and the authority to investigate under the Administrative Procedures Act prohibits investigation by an agency "except as authorized by law." 5 U.S.C. § 555(c). Title IX does authorize the promulgation of regulations. In contrast to the regulatory scheme of Title VI, however, the ED has not issued a regulation authorizing investigations under Title IX. *Compare* 34 C.F.R. § 100.7(c).[15]

Defendants also cite several cases which turn on factual disputes. *See e.g., Endicott Johnson Corp. v. Perkins,* 317 U.S. 501, 63 S.Ct. 339, 87 L.Ed. 424 (1943). The instant matter, however, involves neither a dispute as to a factual issue nor a mixed question of law and fact. Rather, the issue here is purely legal.

This is not a case in which the respondent argues that it is not within the category of entities the agency is clearly empowered to regulate. *E.g., Endicott Johnson Corp. v. Perkins.* . . . In such a case the issue is the essentially factual one of classification. Here the classification has been conceded and the issue is a purely legal one of whether or not any corporation within that category may be subjected to agency investigation.

*FTC v. Miller,* 549 F.2d 452, 460–61 (7th Cir. 1977) (citations omitted).[16]

▮▮▮▮ The Court is mindful of the Supreme Court's implicit instruction to construe the Department of Education regulations in a narrow fashion. *See North Haven Board of Education v. Bell, supra.* The Court has no doubt that the Department of Education could investigate and regulate the operation of an athletic program in a proper case where the athletic department received federal funds; [17] the instant matter is not such a case. Even granting the ED's interpretive deference, which the Court believes is inappropriate here, the Court has no doubt that the ED has acted ultra vires in endeavoring to subject UR to an onerous and unauthorized

**15.** Section 100.7(c) is notable by way of analogy as it authorizes investigation only of "a possible failure to comply with the regulation," thereby restricting the investigatory power to the program-specific scope of regulation.

**16.** Defendants also rely extensively on *United States v. El Camino Community College,* 600 F.2d 1258 (9th Cir. 1979), cert. denied, 444 U.S. 1013, 100 S.Ct. 661, 62 L.Ed.2d 642 (1980) for the principle of broad investigatory power. There, however, the Court specifically qualified its seemingly broad language by pointing out that:

> Because the college did not challenge the validity of the regulations below, it cannot do so for the first time on appeal. Our view is limited to only the question properly raised below: Do the statutes and regulations prevent HEW from seeking information about programs or activities receiving no Federal assistance?

600 F.2d at 1259.

As the validity of the regulations is the issue in this matter, that decision is of no force here. Similarly, *Camden County School District v. United States Department of Education,* No.

281–40 (S.D.Ga. 7 April 1981), relies on *El Camino* for a similar statement of broad investigatory power. *Camden County* does not otherwise analyze the *El Camino* dictum.

**17.** It is argued by defendants that athletic programs are never earmarked for direct Federal funding and that they may obtain jurisdiction over an athletic department only if indirect funding is considered to be a basis for jurisdiction. Although the ED may find it inconceivable that Congress has chosen not to grant the ED jurisdiction to search through each and every single program or activity in every single university or college or other academic institution in the United States, the fact that Congress has not done so does not give the ED authority to assume such jurisdiction on its own out of "necessity." Defendants' assertion in its final brief that "it is well established that general student financial assistance is sufficient to subject intercollegiate athletics to Title IX" relies entirely on *Bob Jones University v. Johnson, supra* and, as previously discussed, is not authority which is controlling as to the facts under a Title IX case such as this.

investigation of its athletic department.[18] Although the Court cannot say, in light of *North Haven Board of Education*, that the regulations themselves are invalid, it has no trouble in holding that ED should not in the future endeavor to investigate, regulate, coerce, or intimidate colleges and universities with regard to programs or activities that do not receive direct federal financial assistance.

Accordingly, plaintiffs' motion for summary judgment will be GRANTED and defendants will be enjoined from investigating the University of Richmond Athletic Department, and from commencing enforcement proceedings for the University of Richmond's failure to comply with defendants' information demands. Moreover, defendants will be enjoined hereinafter from investigating any program or activity at an educational institution located within the jurisdiction of this Court absent a showing that the program or activity is the recipient of direct federal financial assistance.[19]

And it is so ORDERED.

18. In light of this ruling, defendants' counter-claim that UR is contractually bound to supply the requested information must fail. UR cannot be contractually bound to comply with directives which ED lacks the authority to issue.

19. On 11 June, defendants submitted a supplemental memorandum addressing the effect of the Supreme Court's *North Haven* decision on this motion. On 15 June, plaintiff filed a motion for leave to file a supplemental memorandum addressing the same issue. Plaintiff's motion is GRANTED and the Clerk is DIRECTED to file plaintiff's supplemental memorandum. Both memoranda were considered by Court in reaching its determination on the merits.